539 F.2d 450
 NATIONAL SURETY CORPORATION, Plaintiff-Appellant,
v.
CHARLES CARTER & COMPANY, INC., Defendant Third Party
Plaintiff-Appellee-Appellant,
v.
FIREMAN'S FUND INSURANCE COMPANY, Third Party Defendant.
HUGHES-WALSH COMPANY, Intervening Third Party Plaintiff-Appellee,
v.
MARYLAND CASUALTY COMPANY, Third Party Defendant-Appellant,
United States of America, Intervenor-Appellee.
 No. 75-1366.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 24, 1976.
 
 Charles W. Franklin, Baton Rouge, La., for Natl. Surety Corp.
 John S. White, Jr., Baton Rouge, La., for Maryland Casualty Co.
 Scott P. Crampton, Gilbert E. Andrews, Crombie J. D. Garrett, Stephen M. Gelber, Murray S. Horwitz, Tax Div., Dept. of Justice, Washington, D. C., David W. Robinson, Trial Atty., Walton J. Barnes, Baton Rouge, La., for Charles Carter & Co.
 Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., for United States.
 Robert W. Smith, Baton Rouge, La., for Fireman's Fund.
 Appeals from the United States District Court of the Middle District of Louisiana.
 Before WISDOM, GODBOLD and LIVELY,* Circuit Judges.
 LIVELY, Circuit Judge.
 
 
 1
 This diversity action from Louisiana began as a simple proceeding by the bonding company (National Surety) of a subcontractor (Hughes-Walsh) against the general contractor (Carter) for the balance due under the subcontract between Carter and Hughes-Walsh. Four additional parties were added by intervention and third-party actions. The procedural history of the case was set forth in a pretrial order of the district court as follows:
 
 
 2
 In the original demand, National Surety alleged that Carter contracted with Capital Construction and Improvement Commission for the construction of a health and physical education building at Southeastern Louisiana College; that Carter had entered into a subcontract with Hughes-Walsh as to certain plumbing, heating, ventilation and electrical work; that Hughes-Walsh substantially completed all the work which it had contracted to do, but while its work was in progress, the company was unable to meet its obligations as they matured and it was necessary for National Surety to finance Hughes-Walsh to complete its work on the subcontract; that National Surety had become legally and conventionally subrogated for any amount which Carter is indebted unto Hughes-Walsh, which is alleged to be in the approximate amount of $55,063.69, for which sum amicable demand has been made and for which judgment is prayed, plus interest and costs.
 
 
 3
 Defendant Carter answered this complaint in the principal demand, admitted the contract between Carter and Capital Construction and Improvement Commission and between Carter and Hughes-Walsh. Carter denied that Hughes-Walsh substantially completed its work and denied the subrogation rights of National Surety. Carter alternatively pleaded that the subcontract between Carter and Hughes-Walsh called for payment by Carter to Hughes-Walsh of $376,753.69. Carter pleaded payment of $322,494.27, leaving a balance of $54,259.42 unpaid. As to this unpaid balance, Carter pleaded that it is entitled to a credit or offset in the total sum of $33,529.04, "representing amounts paid by defendant to others to complete work not done or done improperly by Hughes-Walsh Company and to repair damage caused by defective and improper workmanship on the part of Hughes-Walsh Company in the performance of its contract."
 
 
 4
 Hughes-Walsh intervened alleging that it was the subcontractor of Carter bonded by National Surety; that it is entitled to intervene because certain sums are due it by Carter which should be credited against the bond posted by National Surety; and that it would be damaged unless this amount were recovered against defendant Carter.
 
 
 5
 Hughes-Walsh third partied Maryland alleging that "claims of $55,063.69 are made by Carter alleging that these funds were withheld wrongfully from Hughes-Walsh because of acts of negligence of Hughes-Walsh, or acts which may have been negligent, and causing water damage to a building being constructed under the contracts at issue herein." The third party complaint further alleges that Hughes-Walsh "denies any negligence on its part causing any accident and in the alternative shows that in the event and only in the event the Court should find any negligence whatsoever on behalf of Hughes-Walsh Company, Inc., they should be indemnified against such acts of negligence by the policy of liability insurance issued by the Maryland Casualty Company against the type of liability alleged."
 
 
 6
 Hughes-Walsh prayed further that in the event of judgment against it for damages to the building that it have judgment over in its favor and against third party defendant, Maryland Casualty Company for indemnification of such damages together with legal interest and all costs of this Court.
 
 
 7
 Maryland filed motions to dismiss and related pleadings as to the third party demands of Hughes-Walsh, preserving its defenses as to such claims after the Court denied the motions.
 
 
 8
 Maryland subsequently filed an answer pleading special defenses which will be incorporated as its contentions.
 
 
 9
 Charles Carter and Company, Inc. then filed a counterclaim against Fireman's Fund (substituted by National Surety) alleging that in the event its claim of a credit or offset of $33,529.04 could not be treated as a counterclaim without formal amendment, then that amount would be claimed by defendant Carter by counterclaim against the plaintiff, this being the same contention as contained in the "third defense" of Carter's answer.
 
 
 10
 Defendant Carter also filed a third party complaint against Fireman's Fund Insurance Company as the builder's risk insurer of the property involved, contending that in the event it should be found and determined that the water damage forming the basis of the credit, offset or counterclaim against the plaintiff, was caused, in fact, by vandalism, that defendant would be entitled to recover the said sum from Fireman's Fund under the builder's risk coverage. Fireman's Fund as builder's risk carrier filed an answer to the third party petition of Carter denying the allegations of that petition.
 
 
 11
 The United States of America intervened by order of this Court, claiming that it was entitled to any contract funds due Hughes-Walsh as a result of its levy for taxes, which contentions were denied by the National Surety as substituted party, contending that its priority as completing surety was prior to the claims of the government for unpaid taxes of Hughes-Walsh.
 
 
 12
 On the same day that the pretrial order was entered a minute entry was made which recited that the court had determined "that certain issues in this case should be separated, one from the other, for trial . . . ," and ordering that the trial be limited as nearly as possible to issues summarized therein. The issue of the priority of the opposed claims of National Surety as completing surety and the United States of America for unpaid taxes of Hughes-Walsh was not included among those to be tried at that time.
 
 
 13
 A two-day bench trial was held. At the conclusion of the evidence in chief the district court granted a motion for the voluntary dismissal of Fireman's Fund as builder's risk insurer of Carter on a finding that there was no evidence that vandalism was the cause of water damage to the uncompleted gymnasium floor for which Carter withheld $21,128.30. The court denied a motion to dismiss by Maryland Casualty, noting that if the gymnasium floor damage should be found to have resulted from negligence of Hughes-Walsh, Maryland Casualty would owe Hughes-Walsh indemnification under its contractor's liability policy.
 
 
 14
 After rebuttal testimony was presented the case was submitted. The District Judge then announced his decision on most issues while requesting briefs on two issues raised by Maryland Casualty.
 
 
 15
 The contract balance which Carter withheld was found by the district court to total $54,259.42 and consisted of three distinct parts. The general contractor withheld payment of $12,400.74 which it claimed as the cost to it of completing the work which Hughes-Walsh was required to perform and correcting work improperly done by the subcontractor. Carter also withheld $21,128.30 as the cost to it of repairing damage to the gymnasium floor and related expenses. These two items, aggregating $33,529.04, were claimed as offsets against the balance due under the subcontract. The remaining balance of $20,730.38 was not claimed by Carter but was withheld because of the notice of levy which the government served on Carter.
 
 
 16
 In its judgment the district court held that the government is entitled to the $20,730.38 balance "under its lien and levy" and directed that this sum be paid to the United States. The issue of priority as between the claims of National Surety and the government was not a subject either of proof or argument at the trial of the case. In fact, it appears to have been reserved for separate consideration in the court's minute accompanying the pretrial order. Upon National Surety's motion for a new trial the court held that the question of priority was one of law only, and granted the parties an opportunity to brief this issue. Thereafter the court reaffirmed its holding that the government is entitled to priority.
 
 
 17
 On appeal of the priority issue by National Surety the government has conceded that the issue was not fully developed in the district court and has agreed to a remand for further consideration. In remanding this issue we note that the record contains a release on September 15, 1971 of the levy of the United States against property of Hughes-Walsh and service of the release on Carter. The district court made no findings with respect to the effect, if any, of this release of levy on the lien asserted by the government. The government asserts that remand is necessary because the record is not clear as to the nature and extent of National Surety's participation in the completion of the subcontract, whether the money was withheld by Carter as retainages for poor performance or represented accumulated progress payments for prior satisfactory performance, and as to the actual timing of progress payments and retainages. These issues should be developed on remand. The holding that the lien of the United States for unpaid taxes of Hughes-Walsh is a prior claim to that of National Surety as completing contractor is vacated and remanded to the district court for further proceedings.
 
 
 18
 Treating the $12,400.74 withheld by Carter as the second item, we conclude that no error has been demonstrated in the disposition of this fund. The district court found that the amounts claimed for the completion items had been paid and that all "expenditures by Carter were necessitated by a failure of Hughes-Walsh to complete their contract in accordance with the terms and conditions thereof." These findings are fully supported by the evidence and are binding on this court. Rule 52(a), Fed.R.Civ.P. As guarantor of the performance of Hughes-Walsh, National Surety must bear this expense. To the extent that the judgment denies National Surety recovery of $12,400.74 it is affirmed.
 
 
 19
 The district court denied recovery to National Surety of the third item $21,128.30, representing the cost of replacing the damaged gymnasium floor and awarded Hughes-Walsh judgment for this amount against Maryland Casualty. It was undisputed that water ran into the chill system during the night the floor was flooded and that it escaped from the system through an opening in the top of a pipe from which a valve had been removed. The district court found that the damage to the gymnasium floor was caused by the negligence of Hughes- Walsh. Subsidiary findings were made that Hughes-Walsh had not completed its work on the air conditioning system when the leak which caused the damage occurred, that water had been turned into the chill line by an employee of Hughes-Walsh and that it was the responsibility of Hughes-Walsh to make certain that the system remained closed while it was connected to a source of water. The court found that it was not necessary to determine who had removed the valve where the leak occurred since Hughes-Walsh had the duty to maintain the system as a closed line, and the missing valve was its responsibility. The court also held that Hughes-Walsh was legally responsible for operation of the water line which was the source of water to the chill system.
 
 
 20
 The parties have extensively briefed and argued the Louisiana law of res ipsa loquitur. However, the district court did not premise its finding of negligence upon application of the res ipsa loquitur doctrine. The only reference by the court to res ipsa occurred prior to the testimony of the witness McKenzie, which supplied much of the basis for findings of actionable negligence. The district court found that Hughes-Walsh owed certain specific duties with respect to the chill system, that it had breached one or more of these duties and that injury had occurred to the building as a result thereof. Though control of the chill system was central to the court's finding of negligence, this was not a case where an unexplained event resulting in injury was attributed to presumed acts of negligence. The district court had no reason to rely on res ipsa loquitur since it found breaches of specific duties, both acts and omissions on the part of Hughes-Walsh, which constituted negligence.
 
 
 21
 Upon careful examination of the record, including the transcript of evidence, we conclude that the findings of the district court on the issue of negligence are not clearly erroneous, but are supported by substantial evidence. It was undisputed that an employee of Hughes-Walsh had connected a small water line from the main water line to the chill system. It was also undisputed that water was running into the chill system through this connecting line when the flooding was discovered. On conflicting evidence the district court found that Hughes-Walsh employees had been testing the chill system prior to the time that the damage occurred and were responsible for the system being left connected to the water source overnight. These findings support the court's conclusion that the failure of Hughes-Walsh to make certain that no openings existed in the system, regardless of how an opening may have occurred, was negligence.
 
 
 22
 There is no provision in the agreement between Carter and Hughes-Walsh which permits Carter to withhold payments due thereunder because negligent acts of Hughes-Walsh caused damage to the building. The right of Carter to withhold payment is covered in paragraphs 9 and 15 of the agreement as follows:
 
 
 23
 9. Should Subcontractor at any time refuse or neglect to supply a sufficient number of properly qualified workmen or a sufficient quantity of materials of proper quality, or abandon the work or fail in any respect to prosecute the work covered by this contract with promptness and diligence, or fail in the performance of any of the agreements herein contained, Contractor may, at its option, after forty-eight (48) hours' notice to Subcontractor, provide any such labor and materials and deduct the cost thereof from any money then due or thereafter to become due to Subcontractor under this contract or otherwise; or Contractor may, at its option, terminate this contract and, for the purpose of completing the work covered by this contract, Contractor shall have the right to take possession of all the materials, tools and appliances belonging to Subcontractor at the site of the work, and Contractor may either complete said work itself or may employ, or contract with, any other person or persons to complete the work and provide the materials therefor; and in case of such termination of this contract, Subcontractor shall not be entitled to receive any further payment under this contract until said work shall have been finished completely and payment therefor made by Owner, at which time if the unpaid portion of the amount to be paid under this contract exceeds the charges, expenses and damages sustained by the Contractor in completing the work or as a result of such default, such excess shall be paid by Contractor to Subcontractor, but if such charges, expenses and damages shall exceed said unpaid portion, Subcontractor shall pay the difference to Contractor.
 
 
 24
 15. Contractor agrees to pay Subcontractor for said work the sum of THREE HUNDRED SEVENTY FIVE THOUSAND AND NO/100 Dollars ($375,000.00.) subject to additions and deductions as herein provided, and such sum shall be paid by Contractor to Subcontractor as the work progresses in monthly installments as follows:
 
 
 25
 On the 25th day of each month Subcontractor shall present to Contractor a statement of the work done during the preceding month, which statement, when checked and approved by Contractor, will be paid within five (5) days after receipt of payment from Owner, providing progress of the work and payments for labor used and material purchased by Subcontractor have been satisfactory, provided that Contractor may, at its option, retain 10%, or the percentage specified in the Contract Documents, of each estimate until final payment, which shall be made after completion of the work covered by this contract and written acceptance thereof by the Architect, and full payment therefor by Owner, provided Subcontractor has furnished evidence, if requested, that all claims for labor and materials have been paid, and provided further that Subcontractor has complied with all the provisions of this contract.
 
 
 26
 Paragraph 9 permits withholding for the subcontractor's failure to perform the obligations of the agreement and paragraph 15 permits retainage of 10% of each estimate until final payment following completion and acceptance by the architect.
 
 
 27
 The duties of the subcontractor to indemnify the general contractor and to carry public liability insurance are covered in paragraph 10 as follows:
 
 
 28
 10. (a) Subcontractor agrees to save and indemnify and keep harmless Contractor against all liability, claims, demands or judgments for damages arising from accidents to persons or property occasioned by Subcontractor, his agents or employees, and against all claims or demands for damages arising from accidents to Subcontractor, his agents or employees, whether occasioned by Subcontractor or his employees or Contractor or its employees or any other person or persons; and Subcontractor will defend any and all suits brought against Contractor on account of any such accidents, and will pay any judgment rendered in such suits, and will reimburse and indemnify Contractor for all expenditures or expenses, including court costs and counsel fees, made or incurred by Contractor by reason of such accidents.
 
 
 29
 (b) Subcontractor shall carry such employer's liability or workmen's compensation insurance as may be necessary to insure the liability of the parties hereto for injuries to, or death of, Subcontractor's employees, and Subcontractor shall also carry adequate public liability insurance covering accidents to persons and property occasioned by Subcontractor or Contractor in the performance of any of the work covered by this contract, . . . .
 
 
 30
 The record discloses that shortly after Carter ascertained the extent of the damage to the gymnasium floor it made a demand on Hughes-Walsh and Maryland Casualty. Charles Carter, president of the general contractor, testified that both Hughes-Walsh and Maryland Casualty refused to replace the damaged floor and that both were then notified that Carter would have it replaced "and charge it to them(.)" The additional work necessitated by the water damage was performed by the flooring subcontractor within a few weeks after the damage occurred. On November 4, 1969 Carter issued a debit memo (Carter Exhibit No. 5) charging the account of Hughes-Walsh with $21,128.30, representing expenses incurred by Carter as the result of water escaping from the chill line and damaging the building. Carter made no further attempt to collect this sum from Hughes-Walsh or Maryland Casualty and claimed it (along with the $12,400.74) as "a credit or offset" in its answer to National Surety's complaint. The answer was filed on March 15, 1971, more than one year after the flooding incident occurred.
 
 
 31
 Maryland Casualty argues that Carter's claim for its expenses in connection with the water damage is prescribed, or barred, by the one-year Louisiana statute of limitations applicable to tort actions. LSA-Civ.Code Art. 3536. Undoubtedly an action by the owner of the building against either Carter or Hughes-Walsh would have been a tort action subject to the one-year statute. However, Carter's claim against Hughes-Walsh is for indemnity under the subcontracting agreement. This is an action arising under a contract and it is subject to the applicable ten-year limitation. LSA Civ.Code Art. 3544. At the very least Carter's claim "emanates" from the subcontract. See Harper v. Metairie Country Club, 258 La. 264, 246 So.2d 8, 11 (1971). Carter's claim was not prescribed.
 
 
 32
 After Hughes-Walsh intervened in the action Carter filed an answer to National Surety's amended complaint and a counterclaim. By a separate pleading the counterclaim was also asserted against Hughes-Walsh as intervening plaintiff. (App. 95-96). The counterclaim asserted a claim for $33,529.04 "for damages resulting from the failure of Hughes-Walsh Company to perform its contract with defendant (Carter) in a good and workmanlike manner and in accordance with the plans and specifications made part thereof." The district court construed these and other pleadings liberally as placing in issue the entire dispute between Carter, Hughes-Walsh and National Surety. Though not pleaded explicitly this included Carter's right to indemnity by Hughes-Walsh for property damage caused by the subcontractor. Even without the counterclaims, the court could have considered the claim of offset in the original answer as a counterclaim. Rule 8(c), Fed.R.Civ.P. Upon a finding that Carter was required to expend $21,128.30 by reason of the negligence of Hughes-Walsh, Carter was entitled to judgment in this amount on its counterclaim. Upon remand judgment will be entered directing that Carter recover $21,128.30 from Hughes-Walsh on the counterclaim, to be satisfied by Maryland Casualty as hereafter provided. As has been noted, however, the effect of the district court judgment was to require National Surety to bear this loss. National Surety did not insure against the negligence of Hughes-Walsh resulting in damage to property of others. It fulfilled its obligation by completing the work covered by the subcontract, except for those items aggregating $12,400.74 which this decision permits Carter to withhold. Subject only to determination of priority between it and the government, National Surety is entitled to recover the unpaid contract balance of $41,858.68.
 
 
 33
 Maryland Casualty has contended from the beginning that it was not properly made a party to this action. In its answer Maryland Casualty stated that Hughes-Walsh was not entitled to file a third-party complaint since it did not qualify as a "defending party" under Rule 14, Fed.R.Civ.P. Rule 14(b) provides that a plaintiff against whom a counterclaim has been asserted "may cause a third party to be brought in under circumstances which under this rule would entitle a defendant to do so." Carter was asserting a counterclaim against Hughes-Walsh which included a claim for its expenses in connection with the damage to the gymnasium floor. To this extent the claim was one for which Maryland Casualty would be liable to Hughes-Walsh in indemnity if negligence were established. Thus Hughes-Walsh was entitled to bring Maryland Casualty in as "a person not a party to the action who is or may be liable to him for all or part of the plaintiff's (counterclaimant's) claim against him." Rule 14(a), Fed.R.Civ.P.
 
 
 34
 Maryland Casualty also contended in its answer that Carter had no legal right to retain money extra-judicially. While Carter had no legal right to withhold payments from Hughes-Walsh on account of the damage to the gym floor, this error has been rectified by the holding that Carter must pay the amount so withheld into court for the benefit of National Surety or the government, both of whom claim through Hughes-Walsh.
 
 
 35
 Maryland Casualty also argues that Carter did not claim its right of offset on the basis of negligence of Hughes-Walsh and that negligence was not properly made an issue. Though Carter did not charge Hughes-Walsh with negligence in its pleadings, it filed an answer to interrogatories on July 6, 1971 in which it stated that the "back-charge" in the amount of $21,128.30
 
 
 36
 represents charges incurred by Charles Carter & Company, Inc., as the result of damages done to the building and principally to the floor thereof by water from the water system installed by Hughes-Walsh Company. This water came from an open line near or at the top of the building which affiant is informed and believes was left open by employees of Hughes-Walsh Company while they were engaged in bleeding the line and filling it up with water to test it. They left the water on overnight and it overflowed from the line causing this damage. Hughes-Walsh Company was requested to repair the damage and failed or refused to do so whereupon the damage was repaired by Charles Carter & Company, Inc., for the amount stated above.
 
 
 37
 In its third-party complaint Hughes-Walsh alleged that Carter had withheld payments "because of acts of negligence of Hughes-Walsh in causing water damage to a building being constructed under the contracts at issue herein." In its answer Maryland Casualty denied that Hughes-Walsh had been negligent and pled contributory negligence and assumption of risk by Carter as affirmative defenses. At the trial the issue of negligence was addressed by all parties. It was not necessary that Carter's answers and counterclaims be formally amended to charge negligence. Rule 15(b), Fed.R.Civ.P.
 
 
 38
 In overruling Maryland Casualty's motion to dismiss the district court stated that if a valid claim were made against Hughes-Walsh which was within the coverage of the Maryland Casualty policy it would make no difference whether Maryland Casualty was a party or not, since Hughes-Walsh would have the right to go against Maryland Casualty for indemnification. Later, in its written findings of fact and conclusions of law the district court stated " Maryland Casualty Company does not deny that their liability policy was issued to protect Hughes-Walsh against its negligence . . . ." This statement has not been challenged.
 
 
 39
 The Maryland Casualty policy requires it to "pay on behalf of the insured all sums which the insured, by reason of contractual liability . . . , shall become legally obligated to pay as damages because of . . . property damage . . . ." The district court erred in directing Maryland Casualty to pay the sum of $21,128.30 to Hughes-Walsh, its insured. That portion of the judgment is vacated since the policy does not provide for payment to the insured, but payment on behalf of the insured. Upon remand the district court will enter judgment directing that Carter recover $21,128.30 from Maryland Casualty, Carter being the party to whom Hughes-Walsh is contractually obligated to pay this sum because of property damage resulting from its negligence.
 
 
 40
 The judgment of the district court is vacated and the cause is remanded to the district court with directions to enter judgment permitting Carter to withhold $12,400.74 of the balance due on its subcontract with Hughes-Walsh; requiring Carter to pay into court the balance of the unpaid portion of the contract price, $21,128.30, in addition to the sum of $20,730.38 previously paid in, pending final disposition on remand of the competing claims of National Surety and the United States; granting Carter a judgment for $21,128.30 against Maryland Casualty, and for such other proceedings and orders as may be required.
 
 
 
 *
 Of the Sixth Circuit, sitting by designation