523 F.Supp. 703 (1981)
UNITED STATES of America, Plaintiff, LULAC and G.I. Forum, Plaintiffs-Intervenors,
v.
STATE OF TEXAS, et al., Defendants.
Civ. A. No. 5281.
United States District Court, E. D. Texas, Tyler Division.
July 30, 1981.
*704 *705 *706 *707 *708 Joseph Rich, Washington, D.C., Theresa T. Milton, Civil Rights Div., Dept. of Justice, Washington, D.C., John H. Hannah, Jr., U. S. Atty., Tyler, Tex., for the U. S.
Peter D. Roos, San Francisco, Cal., Ricardo DeAnda, MALDEF, Laredo, Tex., Roger Rice, Cambridge, Mass., Norma Solis, MALDEF, San Antonio, Tex., for plaintiffs-intervenors.
Mark White, Atty. Gen. of Tex., Richard L. Arnett, Asst. Atty. Gen., Austin, Tex., for the State of Tex.

ORDER
JUSTICE, Chief Judge.

I. PROCEDURAL HISTORY
Proceedings in the above-captioned civil action have been carried out within the ambit of a statewide desegregation suit instituted by the United States in this court on March 6, 1970. Leave to intervene, sought by the G. I. Forum and the League of United Latin American Citizens (LULAC), was granted on July 10, 1972, permitting those parties to participate "for all purposes as representatives of all persons of Mexican-American descent or nationality in the State of Texas." In their complaint in intervention, filed on that date, intervenors alleged, inter alia, that the defendants had failed "to take affirmative steps to correct segregatory and discriminatory educational practices throughout the State of Texas which deny Mexican-American and black children their right to equal educational opportunity ...." Complaint in Intervention, ¶ 27. On June 4, 1975, the G. I. Forum-LULAC intervenors filed a motion for supplemental relief. An amended motion for relief, listing twenty-six individual Mexican-American children as party-plaintiffs, was filed on October 4, 1977. The United States filed its separate motion for relief on January 20, 1978.
After the completion of extensive discovery, the final pre-trial order in this case was filed on November 20, 1978. Supplemental exhibit lists were subsequently tendered by the parties as amendments to that order. At the outset of trial, on December 3, 1979, it was announced that the defendants had withdrawn their prior objections to many of the proposed findings of fact listed by the plaintiff-intervenors in the pre-trial order. The agreed fact statements, introduced into evidence as Plaintiff-Intervenors' Exhibit No. 409, were stipulated to orally in open court by counsel for all parties.
The non-jury trial consumed a total of eight days. In addition to the stipulated facts and live testimony adduced at trial, *709 the parties submitted voluminous documentary evidence and deposition testimony for the record. Several months after the conclusion of trial, both the plaintiff and plaintiff-intervenors filed extensive post-trial briefs. In lieu of a brief, defendants filed a document denominated "Defendants' Proposed Opinion", one hundred and fourteen pages in length.
A memorandum opinion, based upon this comprehensive trial and post-trial record, was entered on January 9, 1981. 506 F.Supp. 405 (E.D.Tex.1981). The defendants were found to have violated the constitutional and statutory rights of Mexican-American school children throughout the State of Texas. The parties were ordered to meet in an effort to formulate a proposed remedial decree. Since no agreement was forthcoming, the parties submitted separate plans of relief. Following the receipt and consideration of those submissions, an equitable decree was entered on April 17, 1981, in accordance with the previously-filed memorandum opinion. The order requires the State of Texas and its educational agencies to improve and expand their programs of bilingual instruction for Mexican-American public school students possessing limited proficiency in English. Specific remedial measures are to be phased into existence over a six-year period, beginning with the 1981-1982 school year.
The defendants have levied a trichotomous attack upon the proceedings in this case to date. First, they seek to revamp the evidentiary record presented to the court at trial, some twenty months ago. Specifically, defendants contend that their legal representative, the Attorney General of the State of Texas, was not authorized to stipulate to various findings of fact proposed by the plaintiff-intervenors or to withdraw objections to various findings of fact and exhibits offered by the United States. Accordingly, defendants have moved to withdraw the stipulations from the record and to reinstate their objections to the plaintiff's proposed facts and exhibits.
Second, even if the stipulated facts were properly admitted at trial, defendants argue that the court transgressed its authority by addressing an issue not actually in dispute between the parties. According to defendants, pervasive, de jure discrimination against Mexican-Americans in the field of public education and the state's resulting duty to extirpate all vestiges of that discrimination under the Fourteenth Amendment played no part in this litigation and were not before the court for consideration. Since the resolution of that constitutional issue in the court's memorandum opinion comprised one basis for the relief subsequently ordered, defendants have filed a motion demanding that the opinion be withdrawn and the remedial decree vacated.
Finally, defendants have filed a motion seeking to stay the remedial order issued on April 17, 1981, in its entirety, pending appeal of that order. Defendants base their motion upon the strength of the contentions summarized above, along with a substantive attack upon the specific elements of relief prescribed. Under the applicable criteria for the entry of a stay pending appeal, defendants maintain that such an order is warranted.
Each of these pending motions, described above, raises different legal issues. Yet all three motions assail the conduct of this litigation to date. In the interests of judicial economy, the three motions shall be disposed of by a single order. Such a consolidated approach will serve to place defendants' multifarious contentions in context within the overall course of proceedings in this case during the past eleven years.

II. MOTION TO WITHDRAW STIPULATIONS AND REINSTATE OBJECTIONS.

A. Factual Background.

At the outset of trial, defendants' counsel stipulated in open court to some 456 statements of fact proposed by the plaintiff-intervenors. These stipulations were entered into evidence, without objection, as Plaintiff-Intervenors' Exhibit No. 409. Defendants' *710 counsel also withdrew previously-stated objections to a number of exhibits and findings of fact listed in the final pre-trial order by the United States. That withdrawal of objections had originally been announced by defendants' counsel in a letter to the court dated October 31, 1979, and entered into evidence as Defendants' Exhibit No. 76. These stipulated and uncontested facts, taken together, comprised a significant portion of the probative evidence introduced at trial.
On September 15, 1980, more than nine months after the conclusion of trial, defendants filed a motion to "clarify" the stipulations contained in Plaintiff-Intervenors' Exhibit No. 409. Defendants contended, for the first time, that they had meant to concede only that the statements had, in fact, been made, rather than to admit the truth of the statements themselves. Defendants asked that the stipulations be treated in accordance with that restrictive interpretation.
On December 31, 1980, a lengthy order was entered denying the requested relief.[1] The history of the stipulations was explored in detail, beginning with the protracted negotiations among the parties which produced the agreement formalized at trial. The order recounted the unqualified use of the stipulations by all parties, both during trial and in post-trial submissions. Finally, the defendants' affirmative reliance upon these same stipulations in a related case, United States v. Texas (Gregory-Portland Independent School District), 498 F.Supp. 1356 (E.D.Tex.1980), was described. Defendants' concurrence in the proposed findings of fact, the court concluded, was a calculated element of trial strategy. Under applicable legal standards, the defendants did not meet their heavy burden of justifying the retraction or alteration of that deliberate decision long after the trial had ended.
Some six months after the denial of their motion to "clarify" the stipulations entered at trial, the defendants launched a second attempt to eliminate those stipulations from the case. In a motion filed on July 6, 1981, defendants contended, for the first time, that their counsel was not authorized to stipulate to findings of fact proposed by the plaintiff-intervenors or to withdraw objections to exhibits and fact statements offered by the United States. Defendants argued that they cannot be bound by the unauthorized acts of their attorney. In the interests of justice, they urged that the stipulations be withdrawn and the objections to the United States' exhibits and proposed findings of fact be reinstated. Alternatively, defendants asked that the use of these stipulated and admitted facts be restricted to this particular case.
Defendants offered several affidavits in support of their motion. Susan J. Dasher, Esquire, who served as defendants' trial counsel in her capacity as Assistant Attorney General of the State of Texas, asserted that "... the entering of the stipulations was not authorized by the policy-making officials of the Texas Education Agency [TEA] or my superiors at the Attorney General's Office nor was such authorization sought." At the same time, Attorney Dasher acknowledged that she reviewed the proposed findings of fact with TEA officials, and reached agreement with them "that we would not offer evidence to rebut such proposed findings."
David P. Ryan, Esquire, General Counsel of the TEA, stated in his affidavit that the stipulations introduced into evidence at trial were entered without his knowledge or consent. Thomas Anderson, Executive Assistant to the TEA's Deputy Commissioner for Program Administration and Finance, stated that the agency reviewed the proposed findings of fact during the summer of 1978, resulting in the preparation of internal TEA memoranda which contained a suggested Agency response. According to Mr. Anderson, the Attorney General's Office had a copy of those memoranda and never received any authorization to deviate from the positions expressed therein. On the basis of these affidavits, defendants contended that the Attorney General of the State *711 of Texas, as trial counsel, did not adequately represent the interests of his clients.

B. Attorney's Authority to Enter into Evidentiary Stipulations at Trial.

Complaints by clients concerning the unsatisfactory performance of their attorneys during the course of litigation have abounded throughout the entire history of Anglo-American jurisprudence. E. g., Short v. McCarthy, 3 Barn & Ald. 626; Wilcox v. Plummer, 4 Pet. (29 U.S.) 172, 7 L.Ed. 821 (1830). Although civil litigants are not always satisfied with the actions of their lawyers, it is well settled that they are generally bound by those actions. Link v. Wabash Railroad Co., 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1972); Cooper v. Lewis, 644 F.2d 1077, 1082 (5th Cir. 1981). In Link, plaintiff appealed from the dismissal of his claim after his attorney failed to appear at the scheduled pre-trial conference. "There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client," the Court observed. 370 U.S. at 633, 82 S.Ct. at 1390.
Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have "notice of all facts, notice of which can be charged upon the attorney".
Id. at 633-34 82 S.Ct. at 1390.
The justification for attributing the acts of an attorney to his client during litigation is readily apparent. In preparing pleadings, conducting discovery, participating in the formulation of a pre-trial order, examining witnesses, introducing evidence, filing motions, presenting argument, and carrying out a plethora of other responsibilities in the course of trial, an attorney necessarily serves as the agent of his client. Unless all of the attorney's efforts on his client's behalf are binding in a legal sense, the entire judicial process, including the outcome of that process, is devoid of validity with respect to the parties themselves.
As with any other relationship governed by principles of agency law, not every action by an attorney is imputed to his client. For example, certain constitutional rights enjoyed by a criminal defendant are so fundamental and inherently personal that they cannot be waived by act of counsel. See, e. g., Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In the civil arena, attorneys have no implied authority to compromise or settle their clients' claims or defenses. Holker v. Parker, 7 Cranch. (11 U.S.) 436, 452, 3 L.Ed. 396 (1813) (Marshall, C.J.); United States v. Beebe, 180 U.S. 343, 351-52, 21 S.Ct. 371, 374, 46 L.Ed. 563 (1901). A settlement approved by the parties' attorneys is presumed valid, but can be subsequently declared void upon proof that either counsel lacked special authority from his client to enter into such an agreement. Id. Even in those circumstances, however, a client's failure to protest an unauthorized settlement in a timely manner serves to ratify the agreement "... since it is a client's duty, having actual or constructive knowledge of the settlement and its terms, to express his disapproval within a reasonable time ...." Williams v. Intern. Ass'n. of Machinists & Aerospace, 484 F.Supp. 917, 919 (S.D.Fla. 1978), aff'd. mem. 617 F.2d 441 (5th Cir. 1980). An attorney's lack of authority to settle a civil case without his client's specific consent is one of the few recognized exceptions to the general rule that the actions of a lawyer in his capacity as legal agent irrevocably bind the client he represents.
The entering into evidentiary stipulations, before or during trial, falls squarely within an attorney's sphere of authorized conduct. The Court of Appeals for the Fifth Circuit disposed of that issue in the case of Laird v. Air Carrier Engine Service, 263 F.2d 948 (1959). Writing for the Court, Judge Brown declared:

*712 An attorney has wide authority in the conduct of litigation. He is chosen to speak for the client in Court. When he speaks in Court, whether it be in a formal trial or in an informal pretrial, he speaks for and as the client. Those statements or agreements which dispense with proof of facts are made with respect to the impending trial and until withdrawn [by the court] are not merely evidence as in the case of an ordinary admission. They are absolutely binding. (Emphasis supplied.)
263 F.2d at 953. Even in a criminal case, where a defendant's personal rights must be assiduously protected, the Court of Appeals has held that defense counsel clearly has the authority to make judicial admissions on behalf of his client during the course of trial. United States v. Cravero, 530 F.2d 666, 671-72 (5th Cir. 1976).
Recognizing that an attorney, as agent, has the authority to enter into stipulations and agreements respecting evidence to be offered at trial is basic to the fair and efficient conduct of litigation. Courts must be able to rely upon attorneys to represent the interests of their clients in preparing the pre-trial order and narrowing the factual issues which remain in dispute. Most litigants lack the knowledge, experience, and specialized legal training to make informed decisions respecting trial strategy and the admission of evidence. Accordingly, those decisions are necessarily entrusted to the presumed expertise of their lawyer-agents. A client may restrict the authority of his attorney to act in this or any other specified respect. But such special limitations upon the usual scope of the lawyer-client relationship must be made known to the other parties and to the court at the time these issues arise during the course of litigation, not nineteen months after the conclusion of trial.
Thus, under applicable federal law, the defendant's attorney clearly possessed the initial authority to stipulate to proposed findings of fact and withdraw objections to certain exhibits in executing deliberate trial strategy. That conclusion is unavoidable in light of the authoritative precedent cited above, as well as the reasoning which underlies that precedent. The authority of trial counsel to act in these respects is also a necessary corollary to Rule 16, F.R.Civ.P., which provides that issues to be tried shall be limited "to those not disposed of by admissions or agreements of counsel ..." (emphasis supplied).[2]

*713 C. Legal Standards for Withdrawing Stipulations and Reinstating Objections.

The fact that the actions taken by defendants' counsel at trial were within the authorized scope of the attorney-client relationship does not, in itself, preclude the relief now sought from those actions. Evidentiary stipulations may be modified or set aside in order to prevent manifest injustice. Rule 16, F.R.Civ.P.; Sherman v. United States, 462 F.2d 577, 579 (5th Cir. 1972). The Court of Appeals has held that a district court has an affirmative obligation to relieve counsel from pre-trial stipulations where manifest injustice would otherwise result. Central Distributors, Inc. v. M. E. T., Inc., 403 F.2d 943 (5th Cir. 1968).
The burden on a party seeking relief from a stipulation freely entered into before or during trial is a heavy one. As a general rule, such stipulations are controlling and conclusive, resolving all factual issues according to their contents and framing those issues remaining to be tried. See Downs v. American Employers Insurance Co., 423 F.2d 1160, 1164-65 (5th Cir. 1970). A formal admission by counsel in open court, made a part of the record and used as a foundation for judgment, is a most solemn and binding act. King v. Edward Hines Lumber Co., 68 F.Supp. 1019, 1021 (D.Or.1946). Accordingly, evidentiary stipulations may not be tinkered with absent a clear and convincing demonstration that manifest injustice would otherwise result. City of Lakeland, Florida v. Union Oil Co. of California, 352 F.Supp. 758, 768 (M.D.Fla. 1973).
In determining whether relief from stipulations is warranted, a court should consider the effect of such relief upon the rights of the parties as well as its impact upon the disposition of business by the court. Central Distributors, Inc. v. M.E.T., Inc., 403 F.2d at 946. As litigation proceeds from the pre-trial phase into trial and beyond, the burden on one seeking to alter or withdraw stipulations of fact necessarily increases in order to protect the integrity of the process to date. Thus, "if a party fails to seek relief from a stipulation until after trial has begun, that factor does not preclude relief but it must be considered." Chatzicharalambus v. Petit, 430 F.Supp. 1087, 1090 (E.D.La.1977). If a party allows an unreasonable amount of time to elapse before protesting an agreement made by his attorney, the client may be found to have constructively ratified that agreement. Williams v. Intern. Ass'n. of Machinists & Aerospace, 484 F.Supp. 917 (S.D.Fla.1978), aff'd mem. 617 F.2d 441 (5th Cir. 1980).

D. Application of Legal Standards to Defendants' Motion for Relief.

Under the stringent standards described above, defendants have not even *714 approached the requisite showing to warrant relief. This motion to withdraw stipulations and reinstate objections to exhibits and fact statements was filed more than nineteen months after defendants' counsel reaffirmed these agreements in open court on the first day of trial. The inordinate delay which preceded this claim warrants a finding of constructive ratification on the part of defendants. At the very least, the passage of nineteen months greatly exacerbates the deleterious impact which granting relief would exert upon the rights of the plaintiffs and the disposition of business by the court. The withdrawal of these stipulations, placing a number of key factual issues into dispute for the first time, would necessitate the retrial of this action and the reformulation of a memorandum opinion. Countless hours of time expended by the court and counsel in litigating this case over the past two years would be rendered null. It would be necessary that the parties set out to re-gather evidence, draft a new pre-trial order, and completely re-try the case. The drastic consequences of providing defendants with the relief sought augments their burden of demonstrating that such relief is necessary to prevent manifest injustice.
Defendants have failed to show that the conduct of their trial counsel has caused them to suffer any injustice whatever. The evidentiary stipulations and agreements, as noted above, were well within the authorized scope of counsel's responsibilities in conducting the trial. Defendants' strategy, discussed more fully in the prior order concerning these stipulations entered on December 31, 1980, was apparently to concede past wrongdoing on the part of the State of Texas and argue that adequate steps were being undertaken, without judicial intervention, to rectify those historical violations.[3]
In hindsight, following the entry of a memorandum opinion and remedial order, defendants apparently regret these tactical decisions made by their legal representative at trial. They believe that the outcome of the case might have been more favorable to them had these stipulations not been entered into. If they were accorded the luxury of a second trial, they would, no doubt, employ a different strategy. But the fact that an attorney makes a perceived strategic miscalculation does not constitute "manifest injustice" under Rule 16. As the Court of Appeals declared in Bury v. McIntosh, 540 F.2d 835, 836 (5th Cir. 1976) (per curiam), "the merits or demerits of an attorney's representation in a civil action are not grounds for invalidating a verdict."
Exceptional circumstances could be conceived of in which an attorney's performance was so deficient that the representation he afforded his client was equivalent to no representation at all. Under such circumstances, it might be manifestly unfair to subject the client to the abject incompetence of his counsel. This, however, is not such a case. Defendants' counsel of record at trial was the Attorney General of the State of Texas, a competent representative of the State in a plethora of suits tried in both state and federal court. The Texas Education Agency, with its own in-house counsel, chose to entrust its interests to the representation of the Attorney General. Significantly, the Attorney General has never repudiated the actions of his authorized assistant who served as lead counsel at trial. No justification has been offered to provide extraordinary protection to the TEA or any other state agency from the consequences of tactical decisions made by the Attorney General of the State of Texas, as legal representative of such agency at trial.
If the defendants are dissatisfied with the quality of representation they received *715 at trial, as exemplified by the evidentiary stipulations and agreements entered into by their counsel, they have a clear remedy under state law in the form of an action for legal malpractice. Link v. Wabash Railroad Co., 370 U.S. 626, 633-34, n. 10, 82 S.Ct. 1386, 1390, n. 10, 8 L.Ed.2d 734 (1962); Bury v. McIntosh, 540 F.2d 835, 836 (5th Cir. 1976) (per curiam). Such a separate suit, rather than the post hoc nullification of all prior proceedings in the original action, serves as a just and expedient mechanism for resolving disputes between attorney and client concerning the attorney's acts or omissions in the course of litigation. Since the defendants have failed to demonstrate clearly and convincingly that the relief they seek is necessary to prevent manifest injustice, their motion to withdraw evidentiary stipulations and reinstate objections to exhibits and fact statements shall be denied.[4]

III. MOTION TO VACATE ORDER AND WITHDRAW OPINION.
Defendants' second assault upon the proceedings in this case impugns the underlying fairness of the judicial process. Defendants allege that the memorandum opinion and remedial decree entered by the court were predicated upon constitutional violations committed by defendants which were improperly taken into account. Specifically, defendants contend that the issue of de jure discrimination against Mexican-American school children under the Equal Protection Clause of the Fourteenth Amendment was outside the scope of plaintiffs' claims, as expressed by their pleadings. Accordingly, defendants argue, the court lacked authority to consider the existence of such discrimination and its lingering effects in framing a memorandum opinion and prescribing appropriate relief. Defendants have moved that the memorandum opinion be withdrawn and the remedial decree vacated.[5] The proper disposition of that motion requires a careful examination of the tortuous progress of this case, from the filing of the initial complaint on March 6, 1970, through the granting of equitable relief on April 17, 1981.

A. Relevant Procedural History, 1970-1978.

As noted above, this civil action was filed in 1970, stating claims under Title VI of the Civil Rights Act of 1964 and the Fourteenth Amendment to the United States Constitution. Although the focus of trial in September, 1970, and the resulting equitable relief was on the state's failure to desegregate its public schools on the basis of race, the remedial order did recognize "the special educational needs of students whose primary language is other than English" and the importance of developing "specific educational programs designed to compensate minority group children for unequal educational opportunities resulting from past or present racial or ethnic isolation ...." Thus, the issue of providing compensatory instruction to overcome the effects of unlawful discrimination was embodied in this case from the outset, more than ten years ago.
On July 10, 1972, the G. I. Forum and LULAC were granted leave to intervene and filed their complaint in intervention. *716 The complaint alleged continuing violations by the defendants of the constitutional rights of Mexican-American public school children throughout the State of Texas. Specifically, intervenors claimed that the defendants
... have contributed to and have failed to investigate adequately and to take affirmative steps to correct segregatory and discriminatory educational practices throughout the State of Texas which deny Mexican-American and black children their right to equal educational opportunity ....
Complaint in Intervention (July 10, 1972), ¶ 27. The intervenors demanded that the court order
... prompt, affirmative and effective action by Defendants in dismantling dual school systems in Texas, in ending all forms of invidious and discriminatory treatment which is found to be in violation of due process and equal protection guarantees of the Constitution of the United States in the public schools under the jurisdiction and control of Defendants, in requiring school districts to institute special programs to compensate minority children for past and present discriminatory treatment and in meeting the educational needs of all children presently excluded from effective participation in public educational programs in Texas because their primary language is other than English.
Id., Prayer for Relief, ¶ 5. This pleading, filed more than seven years prior to trial, clearly put the defendants on notice that the constitutional issues they protest now were at the very heart of the plaintiff-intervenors' legal claims.
On June 4, 1975, the G.I. Forum-LULAC intervenors filed a motion to enforce the court's prior remedial decrees entered in this case and for supplemental relief. In their motion, the intervenors set forth two additional grounds for relief not mentioned in their original complaint in intervention filed three years earlier. First, they stated a cause of action under Title VI of the Civil Rights Act of 1964, based upon the Supreme Court's decision in Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). Second, they alleged that the defendants had violated § 204(f) of the Equal Educational Opportunities Act of 1974, codified at 20 U.S.C. § 1703(f). The Lau decision and the enactment of the Equal Educational Opportunities Act, both taking place during 1974, gave the plaintiff-intervenors two powerful litigation weapons which had not been available in 1972. Accordingly, the focus of the suit shifted in 1975 to these new avenues of relief. Yet the motion for supplemental relief filed during that year did not purport to eliminate the constitutional issues of equal protection and compensatory education raised by intervenors' original pleading. On the contrary, constitutional violations were specifically alleged in five separate paragraphs of that motion. The motion also made reference to the Keyes case [Denver School District Number One, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 27] where, according to the intervenors, the district court had "ordered the defendants to implement a bilingual/bicultural program for Spanish-speaking children in the Denver schools, as part of its overall desegregation order, to eliminate the effects of past discrimination against Mexican-American students." (emphasis supplied), Motion for Supplemental Relief (June 4, 1975), ¶ 9.
The defendants had no doubt that the intervenors were claiming that constitutional violations had taken place. On November 3, 1976, defendants filed an application for the convening of a three-judge court, pursuant to 28 U.S.C. § 2281. "It is clear," defendants declared, "that Movants [plaintiff-intervenors] allege constitutional violations by Defendants and request injunctive relief to cure those alleged violations ...." Application for Three-Judge Court (Nov. 3, 1976), p. 2. (Emphasis in original.)
Opposing the transfer of the case to a three-judge court some six years after the commencement of suit, plaintiff-intervenors agreed to file an amended motion for supplemental relief, deleting all explicit references to constitutional violations. The amended motion was filed on October 4, *717 1977, relying on the court's prior remedial orders, Title VI of the Civil Rights Act, and § 204(f) of the Equal Educational Opportunities Act as grounds for relief. The United States filed its motion for supplemental relief, also without reference to the Constitution, on January 20, 1978. Although plaintiff-intervenors' original complaint in intervention, filed back in 1972, had never been formally withdrawn or superseded, it could be concluded that the constitutional issues raised in that pleading were voluntarily excluded from the case by the plaintiff and plaintiff-intervenors in late 1977 and early 1978. If trial had been held at that time, it might have been restricted accordingly to the statutory claim raised in the amended motions for supplemental relief.[6]
On June 8, 1978, the defendants' application for a three-judge court to try this case was denied. In its written order, the court pointed out that the plaintiff-intervenors had excised their constitutional claims, making a three-judge court clearly inappropriate "at this stage of the proceedings." The order proceeded to discuss several reasons why a three-judge court might not be necessary "even if the motion in intervention retained the constitutional issues." At the conclusion of the order, the court stated that renewed consideration of the three-judge question would be appropriate "when the constitutional question ripens."
The Court does not mean, however, to indicate that when and if the constitutional question should emerge, a three-judge court would necessarily be required. The question whether a state statute, which requires certain relief to a disadvantaged class, in fact conflicts, for three-judge court purposes, with the Constitution by virtue of the Constitution's requiring more drastic relief, seems sufficiently sui generis to merit additional reflection at the appropriate time.
Thus, while the constitutional issues were deemed to be outside the scope of the litigation on June 8, 1978, the possibility that those issues might be subsequently reinstated was evident to the court and communicated to all parties through the text of this order.
The defendants' contention that the court erroneously addressed their Equal Protection violations in its memorandum opinion and remedial decree rests almost entirely upon the significance of the denial of their motion for a three-judge court. Defendants point out that no amended pleadings were filed following the order entered on June 8, 1978. "Thus," they argue, "the defendants were clearly led, indeed compelled, to believe that this litigation did not involve constitutional claims." Motion to Vacate Order and Withdraw Opinion (July 6, 1981), p. 3. That is the essence of their motion.

B. Relevant Procedural History, 1978-1980: The Rest of the Story.

The glaring flaw in defendants' argument is that it conveniently ignores the subsequent events which brought the constitutional issues back into the case for resolution. Defendants have presented an incomplete, and hence distorted, account of the relevant facts. An examination of the course of litigation during the two years which followed the denial of defendants' application for a three-judge court confutes the asserted grounds for relief.

1. The Final Pre-Trial Order.
On November 20, 1978, following protracted negotiations among the parties, the *718 final pre-trial order was filed with the United States District Clerk. That extensive order, some 195 pages long, included the factual and legal contentions to be tried, along with lists of trial witnesses, exhibits, and deposition testimony. All of the parties enumerated constitutional issues among those they intended to litigate at trial. The plaintiff-intervenors proposed eighteen conclusions of law, including the following:
The historical acts of segregation and linguistic bias by the Defendants as proven in multiple court cases and administrative determinations create an obligation on the Defendants to eliminate root and branch the vestiges of such policies. Given these findings, it is appropriate for this Court to order bilingual instruction for all LESA's [Limited English-Speaking Ability Students] in the State.
Final Pre-Trial Order (November 20, 1978), p. 146.
Allegations of unconstitutional conduct committed by defendants pervaded the contentions of law and fact put forth by the United States. Some ten pages of the pre-trial order (pp. 83-92) listed proposed findings of fact chronicling the long history of pervasive, intentional discrimination against Mexican-American students throughout the State of Texas. The allegedly deleterious impact of such discrimination upon the educational performance of Mexican-American students was set out on pages 93 through 95 of the order. In its contentions of law, the United States asserted: "[n]ot only is the State responsible for inactivity in meeting the needs of Mexican-American students, but also for its participation in a long history of discrimination against Mexican-Americans in its schools, including affirmative discrimination against the use of the native language of Mexican-American students by both teachers and students." Final Pre-Trial Order (Nov. 20, 1978), p. 148. On the issue of relief, the United States maintained that the court and parties should be guided by the equitable principles applied in school desegregation cases, citing three such cases decided by the Supreme Court under the Fourteenth Amendment. Id. at 149. Recognizing the reluctance of courts to become involved in the formulation of educational policy, the United States asserted that such policy was counterbalanced by "the stringent standards courts impose when discrimination on the basis of race or national origin is at stake. In this case, the defendants have participated in a long historical pattern of discrimination." Id. at 150.
In light of the numerous references to constitutional claims under the Equal Protection Clause, raised by both plaintiff and plaintiff-intervenors in the pre-trial order, the contention that defendants lacked notice regarding the presence of those issues in the case is wholly untenable. Moreover, the defendants themselves set forth contentions of law with respect to the connection between past discrimination and compensatory bilingual instruction. "Bilingual education is not a substitute for desegregation," defendants declared in their portion of the pre-trial order. Id. at 153. "A meaningful desegregation plan," they acknowledged, "must provide for the transition of Spanish-speaking children to the English language." Id. Thus, while the constitutional issues of Equal Protection had been excised from this case in June, 1978, those issues had been re-injected by the time the final pre-trial order was filed on November 20, 1978.[7]

*719 2. The Trial of the Case.
This case was tried in accordance with the final pre-trial order of November 20, 1978, as amended by supplemental exhibit lists and stipulations entered into on December 3, 1979, the first day of trial. Those stipulations pertained, in large part, to the history of intentional discrimination against Mexican-Americans within the Texas public schools. E. g., Pl.-Int. Ex. 409, Nos. 701, 704, 706, 710, 711, 729, 735, 748, 750. Defendants also stipulated to the harmful, lingering effects of that discrimination. E. g., Pl.-Int. Ex. 409, Nos. 8, 702, 707, 709. Far from being unaware of these evidentiary stipulations or their content, defendants' counsel began her opening statement by conceding: "Your Honor, it's true that we have stipulated to large parts of this case." T. 21.
In addition to these stipulations, the record reveals numerous exhibits introduced into evidence at trial which buttressed plaintiffs' constitutional claims. E. g., Pl.-Int. Ex. Nos. 165, 186-199, 437. Defendants did not object to any of this evidence on the basis of relevance or any other grounds. Thus, apart from the repeated references to Equal Protection violations in the pre-trial order, those constitutional issues were put before the court through a variety of evidence introduced at trial.

3. Defendants' Proposed Opinion.
Following the completion of trial, the parties were accorded leave to file written submissions advocating the appropriate resolution of the various issues to be decided by the court. On May 19, 1980, defendants filed a 114-page document styled "Defendants' Proposed Opinion", stating exactly how the defendants thought the case should be decided. The bulk of defendants' submission consisted of a theoretical and factual analysis of educational programs for children of limited English proficiency within the State of Texas. In the last five pages of their opinion, the defendants examined what they viewed as the relevant legal standards in a section entitled "Compensatory Education Under the Fourteenth Amendment." Defendants' Proposed Opinion (May 19, 1980), pp. 110-114. The defendants observed that constitutional claims for bilingual instruction could be raised on two different theories. First, plaintiffs could argue that there is an independent Equal Protection right under the Fourteenth Amendment to bilingual education. Alternatively, plaintiffs could make a claim for compensatory bilingual instruction in the context of a desegregation remedy. "This Court," defendants concluded, "is treating a challenge under the latter approach. Indeed, this case arises under the very same docket that fashioned bilingual/bicultural relief in the de jure segregation context of the San Felipe Del Rio School District." Id., at 110-111.
Defendants proceeded to argue that the relief sought by plaintiffs was inappropriate, since the de jure discrimination complained of had been substantially remedied by prior court order and state action. Id. at 111. Demanding that the court utilize "the analysis which educational challenges under the Fourteenth Amendment require," defendants discussed a number of constitutional decisions which supported their position. Id. at 111-114. The conclusion of the defendants' memorandum opinion declared: "[T]his Court cannot find that the existing bilingual education program in the State of Texas violates the equal protection clause of the Fourteenth Amendment to the United States Constitution." Id. at 114.
Thus, the opinion which the defendants proposed for adoption by the court, based upon the evidence introduced at trial, focused on the very same constitutional issue they now maintain was illegitimately injected into the case by the actual memorandum opinion entered on January 9, 1981. Defendants' plain recognition that the compensatory education issue was in controversy, manifested by the pre-trial order, proceedings *720 at trial, and defendants' own proposed memorandum opinion, belies their recently conceived claim of prejudice and surprise. Placed within the context of the entire course of litigation, the particular episode singled out by defendants exerted no permanent effect upon the scope of this case.

C. Application of Relevant Legal Standards.

The history of proceedings, as described in detail above, demonstrates that, as a factual matter, the defendants were cognizant that a Fourteenth Amendment compensatory education claim was at issue. But defendants contend that all constitutional issues, including that one, were forever excised from the case when their application for a three-judge court was denied in June, 1978. The validity of that argument depends upon an application of relevant legal standards to the subsequent course of events already described.

1. The Binding Effect of the Final Pre-Trial Order.
The dispositive role of the final pre-trial order in framing the issues to be tried is derived from the text of Rule 16, F.R.Civ.P.:
Pre-Trial Procedure; Formulating Issues
The court shall make an order which recites the action taken at the [pre-trial] conference, the amendments allowed to the pleadings, and the agreements made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel; and such order when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice.
The Court of Appeals has consistently stressed that the pre-trial order is necessarily controlling, binding all parties in accordance with its terms. E. g., Hodges v. United States, 597 F.2d 1014, 1017 (5th Cir. 1979); Funding Systems Leasing Corp. v. Pugh, 530 F.2d 91, 95 (5th Cir. 1976). The proper interpretation of the pre-trial order and the allowance of modifications to avoid manifest injustice are within the sound discretion of the trial judge. Hodges v. United States, 597 F.2d at 1018; Burdis v. Texas & Pacific Ry. Co., 569 F.2d 320, 323 (5th Cir. 1978).
One derivative legal principle of particular importance in this case is that the pre-trial order supersedes all prior pleadings, serving, in effect, as the operative complaint and answer in the case. As the Court of Appeals has reiterated on several occasions, the pre-trial order becomes "the governing pattern of the lawsuit." E. g., Morales v. Turman, 535 F.2d 864, 867 n. 7 (5th Cir. 1976), reversed on other grounds, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977); Steed v. Central of Georgia Ry. Co., 529 F.2d 833, 837 (5th Cir. 1976), cert. denied 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334; Pacific Indemnity Company v. Broward County, 465 F.2d 99, 103 (5th Cir. 1972). In Morales, the Court specifically noted that the pre-trial order was to be looked to for the purpose of determining whether it was necessary to conduct trial before a three-judge court in compliance with 28 U.S.C. § 2281. Morales, 535 F.2d 867, n. 7.
Thus, the inclusion of constitutional issues among the proposed findings of fact and conclusions of law listed by all of the parties within the final pre-trial order in this case necessarily placed those issues within the compass of litigation. Once the final pre-trial order was filed on November 20, 1978, the more limited set of claims set out in the plaintiff-intervenors' amended motion for supplemental relief and referred to in the order denying defendants' application for a three-judge court was superseded and rendered meaningless. Defendants' contention that the obsolete motion for supplemental relief continued to limit the scope of trial even after the filing of the final pre-trial order is wholly without merit.[8]

*721 2. Trial of Constitutional Issue by Consent.
Even if the final pre-trial order in this case had not contained references to the use of bilingual instruction as a remedy for unconstitutional discrimination against Mexican-Americans in the Texas public schools, that issue would have been properly before the court by virtue of the conduct of the parties, during and after trial, as described above. Trial by consent is recognized and expressly authorized by Rule 15(b), F.R.Civ.P.
When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.
The chief problem of interpretation inherent in the rule lies in determining whether all of the facts and circumstances in a particular case warrants a finding of implied consent.
One relatively clear situation of implied consent to place an unpleaded issue before the court is where that issue is addressed by all parties at trial. National Surety Corp. v. Charles Carter & Co., Inc., 539 F.2d 450, 458 (5th Cir. 1976). Similarly, once evidence has been introduced substantially without objection, the relief to be granted and issues to be resolved in accordance with that evidence is not confined to those expressly pleaded. Duke v. Sun Oil Co., 320 F.2d 853, 864 n. 18 (5th Cir. 1963). In expanding the scope of litigation through the introduction of evidence at trial, a party need not announce its intentions or justification for doing so, unless challenged. Wansor v. George Hantscho Co., Inc., 570 F.2d 1202, 1208 (5th Cir. 1978). In Wansor, the Court of Appeals held that the submission of a strict liability claim unstated in the pleadings or pre-trial order was not error since plaintiff introduced evidence on that issue at trial, without objection. "Rule 15(b) does not lose its vitality," the Court noted, "because, in addition to the facts introduced without objection, the pleader failed to include a tag identifying the reasons giving such facts their legal significance." Id.
Just as the introduction of evidence at trial may expand the scope of the litigation under Rule 15(b), evidentiary stipulations entered into by all parties can exert the same effect. In Gibbs v. Randolph, 250 F.2d 41 (5th Cir. 1957), the parties stipulated that the defendant had made some payment to plaintiff. Yet defendant had never asserted that the payment constituted any sort of set-off against plaintiff's claim. Nevertheless, the Court of Appeals held that the set-off was properly treated as a defense at trial. The stipulation, the Court observed,
was at least the equivalent of the receipt of the evidence made unnecessary by the stipulation. This was an amendment by the express or implied consent, F.R.Civ.P. 15(b), of the stipulating parties, neither of whom put any reservations or restrictions *722 on the use or significance of the stipulation.
250 F.2d at 43.
Even the injection of new issues by parties, without objection, in their post-trial submission has been deemed to constitute implied consent to resolve those issues under Rule 15(b). In Rath Packing Co. v. Becker, 530 F.2d 1295 (9th Cir. 1975), affirmed on other grounds sub nom. Jones v. Rath Packing Co., 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 64 (1977), the trial court rendered judgment invalidating a federal regulation. Neither the pleadings nor pre-trial order had raised the validity of the regulation as an issue. Moreover, no evidence respecting the validity of the regulation was introduced by any party at trial. The issue was raised for the first time by plaintiff in its post-trial brief. Defendant, who filed a reply brief, did not object to the plaintiff's insertion of a new theory. The Court of Appeals upheld the lower court's decision to consider the validity of the regulation on its merits:
By failing to object, Rath may be deemed to have acquiesced in an expansion of the issues by the court from those set forth in the pretrial order. Furthermore, the issue, as discussed below, is one of `facial' invalidity under the 5th Amendment which does not require a fully developed evidentiary basis for its resolution.... Since a controversy presently exists between the parties on the issue, and since the judgment of the district court turned in large part on its resolution of this issue, we proceed to the merits of the controversy.
530 F.2d at 1308.
The principal limitation upon an expansive interpretation of implied consent under Rule 15(b) is that such consent will not be found to exist where its recognition would result in substantial prejudice to a party. Two criteria identified by the Court of Appeals in determining the existence of such prejudice are whether the complaining party had a fair opportunity to litigate the issue at trial and whether such party could offer additional probative evidence on that issue if the case were re-tried. International Harvester Credit v. East Coast Truck, 547 F.2d 888, 890 (5th Cir. 1977). Thus, the concept of prejudice in this context is a refinement of the fundamental right of due process. A party must have actual or constructive knowledge of the scope of proceedings, as well as an adequate opportunity to present evidence on all issues embraced therein, before being deemed to have implicitly consented to litigate matters outside the pleadings and pre-trial order.
An application of these legal principles to the facts and circumstances described above demonstrates that the constitutional issues in this case were tried by the consent of the parties under Rule 15(b). Evidence bearing directly upon those issues was introduced without objection. Defendants stipulated to numerous statements of fact which were relevant only in establishing intentional discrimination against Mexican-American children as a predicate for compensatory bilingual education programs. Finally, defendants raised the question of a Fourteenth Amendment violation in general, and the desegregation issue in particular, in their proposed memorandum opinion submitted after trial. In all of these respects, defendants manifested an acquiescence in and affirmative reliance upon the resolution of constitutional issues by the court. The history of this litigation presents a far more compelling justification for finding consent by implication than many of the other cases, cited above, where courts have treated issues not contained within the pleadings or pre-trial order, pursuant to Rule 15(b).
Implied consent cannot be found, however, if defendants would thereby suffer substantial prejudice. Defendants maintain that they could produce probative evidence on the absence or limited nature of any constitutional violations should they be accorded another opportunity to do so. Yet the defendants have already stipulated to pervasive, historical discrimination against Mexican-Americans throughout the State of Texas and to the debilitating consequences flowing from that discrimination. Surely *723 the defendants would not propose to introduce evidence to rebut their own stipulations! The only significant facet of the constitutional claims which could be in dispute at a subsequent trial is the appropriate remedy for proven violations. Yet that issue was litigated vigorously by defendants at the eight-day trial held in December, 1979. Indeed, most of defendants' exhibits, live testimony, and post-trial proposed opinion stressed the beneficial aspects of the state's existing educational programs and the drawbacks of instituting bilingual instruction on a wider scale. Defendants have not shown that they could present any significant new evidence on these points to augment the efforts they have already made.
Virtually all legal precedent interpreting and applying a rule such as 15(b) is necessarily sui generis in nature because it reflects judicial responses to unique fact situations. One case merits special attention, however, because the contentions of the petitioner therein closely resemble those asserted by defendants in this case. In Kuhn v. Civil Aeronautics Board, 183 F.2d 839 (D.C.Cir.1950), the administrative agency rendered a decision based on an issue not stated in the complaint or elsewhere in the record. The petitioner claimed that because he was unaware of the presence of that particular issue in the case, he joined in a stipulation which served to resolve it. The inference was that if he had been apprised of the issue, he would have not joined in the stipulation and would have introduced evidence supporting a contrary position.
Writing for the Court, Judge Bazelon noted:
If it is clear that the parties understand exactly what the issues are when the proceedings are had, they cannot thereafter claim surprise or lack of due process because of alleged deficiency in the language of particular pleadings. Actuality of notice there must be, but the actuality, not the technicality, must govern.
183 F.2d at 842. The Court proceeded to reject petitioner's allegation of unfairness and prejudice, based upon his conduct prior to and during trial. Noting that petitioner had not previously alleged surprise or sought to introduce additional evidence, even after the expanded scope of the litigation was readily apparent, the Court concluded that any such claims had long since been waived.
An examination of the proceedings in this case, in light of the considerations underlying Kuhn, fails to support defendants' claim of substantial prejudice. Undoubtedly, defendants would not adopt the same strategic decisions carried out during trial if they could replay the entire proceeding. They might refuse to stipulate to most of the elements of a Fourteenth Amendment violation. They might object to the introduction of evidence supporting a finding of intentional discrimination and its remaining effects. They might seek to demonstrate through evidence of their own that intentional discrimination had not occurred or that its impact had been ameliorated. They might redraft their proposed memorandum opinion. But under our system of jurisprudence, neither the State of Texas nor any other litigant has the right to try its case over and over again until it is satisfied with the result. If the defendants have suffered any prejudice, it was through their own tactical choices, not the decision of the court to address an issue which had been placed into controversy.
Any remaining doubt about the propriety of finding that the constitutional issues were tried by consent under Rule 15(b) is dispelled by two other provisions of the Federal Rules of Civil Procedure, Rule 1 and Rule 54(c). Rule 1, one of the least frequently cited, but most important, of all the rules, requires that they be construed "to secure the just, speedy, and inexpensive determination of every action." Rule 54(c) provides: "Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." These two rules, taken together, instruct *724 the courts to embrace the entire scope of a legal dispute and provide a remedy which will address all proven, compensable wrongs. Although procedural forms constitute an integral part of the judicial process, to be vigorously enforced, they should not serve as impediments to achieving an efficient and just resolution of disputes through the trial mechanism. The Equal Protection issues were an integral part of this case from its inception and remained inherently in controversy, almost without interruption, before, during, and after trial. It is the underlying purpose of Rule 15(b) that such issues be squarely addressed, not held in abeyance for a second proceeding. Those same principles of judicial economy and fairness infuse Rule 1 and Rule 54(c) as well, further supporting the inescapable conclusion that the constitutional issues were tried by implied consent.

D. Statutory Bases for the Memorandum Opinion and Remedial Decree.

Contrary to defendants' assertions, the equitable relief ordered on April 17, 1981, was based upon a variety of grounds, not merely a finding of unconstitutional conduct under the Fourteenth Amendment. The defendants' failure to eliminate the vestiges of past intentional discrimination practiced against Mexican-Americans constituted a statutory violation of the Equal Educational Opportunities Act, 20 U.S.C. § 1703(b).[9] Moreover, as set forth in detail in the memorandum opinion, 506 F.Supp. at 431-34, defendants have failed to take appropriate action to overcome language barriers impeding Mexican-American students with limited proficiency in English, as required by § 204(f) of the Equal Educational Opportunities Act, 20 U.S.C. § 1703(f). Although the recent decision of the Court of Appeals in Castaneda v. Pickard, 648 F.2d 989 (5th Cir.), interpreting that provision, was not available at the time the remedial order was framed, an analysis of the prescribed relief demonstrates its consistency with Castaneda. See Section IV. E.2., infra. Thus, even if the Equal Protection claims had been permanently removed from the case, the evidentiary record provided ample grounds for the issuance of the remedial decree on April 17, 1981.

E. The Necessity of Convening a Three-Judge Court.

In their motion to vacate the remedial order and withdraw the memorandum opinion, defendants argue, in a footnote, that the constitutionality of their practices under the Fourteenth Amendment could only have been determined by a three-judge court. Since that constitutional issue was within the scope of the litigation, by virtue of the final pre-trial order and by implied consent of the parties, the substance of defendants' contention must be addressed. If plaintiffs' claims were cognizable only before a three-judge court, then the undersigned judge lacked jurisdiction to consider the merits of those claims.
The three-judge court statute on which defendants rely was formerly codified at 28 U.S.C. § 2281 and read as follows:
An interlocutory or permanent injunction restraining the enforcement, operation, or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application thereof is heard and determined by a district court of three judges under section 2284 of this title. *725 In 1976, this statute was repealed by Act of Congress. P.L. 94-381, 90 Stat. 1119 (August 12, 1976). The legislative history of the repeal set forth four grounds for eliminating the three-judge court requirement in cases of the type described in § 2281. First, the convening of three-judge courts imposed a heavy burden upon limited judicial resources. Second, the ambiguity of the statute created widespread uncertainty about the necessity of a three-judge court in particular cases. Third, the original rationale that gave rise to the three-judge court concept in 1910 had virtually disappeared. Finally, existing decisional law provided sufficient safeguards against precipitous injunctive decrees by district courts. Senate Report 94-204, pp. 3-8, reprinted in 1976 U.S.Code & Adm.News at p. 1988 et seq. According to its express terms, the repealer statute did not apply to any action commenced on or before the date of its enactment. P.L. 94-381, 90 Stat. 1119, § 7 (August 12, 1976).[10]
Long before Congress decided to abolish the three-judge court in cases seeking the invalidation of state statutes on constitutional grounds, § 2281 was treated as a technical statute to be narrowly construed in accordance with its literal terms. E. g., Mitchell v. Donovan, 398 U.S. 427, 431, 90 S.Ct. 1763, 1765, 26 L.Ed.2d 378 (1970) (per curiam); Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L.Ed. 800 (1941); Triple A Realty, Inc. v. Florida Real Estate Comm., 468 F.2d 245, 247 (5th Cir. 1972); Wilson v. Gooding, 431 F.2d 855, 858 (5th Cir. 1970), affirmed on other grounds, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1971). As the Court of Appeals observed in Wilson, "[t]he convening of a three-judge court is an extraordinary procedure which in itself imposes a burden upon our federal court system." 431 F.2d at 858. In accordance with this restrictive interpretation of § 2281, a three-judge court was to be convened only where compelled by the express terms of the statute.
On its face, § 2281 sets forth four prerequisites for the convening of a three-judge court. First, plaintiff's suit must seek an injunctive remedy, as opposed to monetary damages or declaratory relief. Second, the requested injunction must be directed at restraining the statewide enforcement or operation of a state statute. Third, the relief sought must be in the nature of restraining a state officer from enforcing or executing the challenged statute or an administrative order rendered pursuant to such statute. Finally, the injunctive relief must be sought on the grounds that the state statute itself is unconstitutional. There is no question that plaintiffs' contentions in this case satisfy the first and second of those requirements. Plaintiffs requested comprehensive injunctive relief to operate against the Texas Education Agency and education officials throughout the state. Plaintiffs affirmatively attacked the constitutionality of defendants' programs as grounds for the requested relief. Yet it appears from plaintiffs' pleadings, the pre-trial order, and the course of trial that plaintiffs' constitutional challenge was to defendants' policies and practices, rather than to any specific provision of state law. Whether such a suit falls within the purview of § 2281 is a question which has received substantial attention in both the Court of Appeals for the Fifth Circuit and the Supreme Court.
In Costello v. Wainwright, 539 F.2d 547 (5th Cir. 1976) (en banc), the Court of Appeals confronted the necessity of convening a three-judge court under circumstances analogous to those presented here. Costello was a class action brought on behalf of Florida state prison inmates alleging a constitutional deprivation of adequate medical care. During the course of litigation, the case was expanded to encompass the related issue of overcrowding as well. The district court, upon finding for the plaintiffs, ordered the Director of the Florida Division of Corrections to reduce prison population. That equitable decree appeared to conflict *726 with the Director's statutory duties to accept all prisoners committed to his custody and to release such prisoners only in accordance with specified provisions of law.
The Court of Appeals vacated the district court's remedial order on the grounds that such relief could only be instituted by a three-judge court under § 2281. Recognizing that plaintiffs had posed no direct attack upon any state statute, the court declared: "A statute does not have to be directly challenged as unconstitutional on its face where the impact of a court order achieves the precise result requiring a 3-judge court." 539 F.2d 552. Since the effect of the court's order was to prevent the state prisons from operating in compliance with state statutes, the order effectively nullified those statutes. In the Court's view, such an action, based on a constitutional claim, could not be undertaken by a single judge.
The Court of Appeals adopted a similar stance in another case involving a constitutional challenge to institutional conditions. Morales v. Turman, 383 F.Supp. 53 (E.D. Tex.1974), was a class action on behalf of all juveniles committed to the custody of the Texas Youth Council. In 1974, this court issued a memorandum opinion finding that the conditions at these institutions violated the rights of plaintiffs under the Eighth and Fourteenth Amendments to the United States Constitution. Comprehensive injunctive relief was ordered to address the pervasive constitutional violations determined to have occurred.
On appeal, the Court of Appeals vacated the memorandum opinion and remedial decree, remanding the case to be tried again before a three-judge court. 535 F.2d 864 (5th Cir. 1976). Noting that the plaintiffs' action involved a wide-ranging constitutional attack on the practices and policies of the Texas Youth Council, the Court of Appeals observed that "the relief granted, like the relief sought, was clearly aimed at alleviating allegedly constitutional deficiencies in the operation of the TYC, and at requiring a comprehensive restructuring of TYC policies and programs." Id. at 869. As a blatant attempt to reform the state's established policies in the field of juvenile corrections, the Court of Appeals concluded, plaintiffs' suit could not be heard by a single district judge. "It is precisely this type of thoroughgoing disruption of a state's autonomous implementation of its own legislative and administrative policies that warrants the added deliberation and procedural protection provided by the three-judge court statute." Id. at 873. Thus in Morales, as in Costello, the Court of Appeals held that a constitutional attack upon a state's policies or programs, authorized by law, was sufficiently akin to an attack upon the underlying statutes themselves to warrant the convening of a three-judge court under § 2281.
If the Court of Appeals properly interpreted § 2281 in Morales and Costello, then plaintiffs' claims in this case should have been placed before a three-judge court. Although plaintiffs did not attack the constitutional validity of any state statute or regulation, they did demand injunctive relief which would necessarily conflict with the provisions of the state's Bilingual Education Act of 1973. Tex.Ed.Code Ann., § 21.451 et seq. (Vernon 1980 supp.). Moreover, the policies and practices challenged by plaintiffs on constitutional grounds were applied statewide in implementing the Bilingual Education Act of 1973 and other provisions of the Texas Education Code.
Yet, the Court of Appeals decisions in both Morales and Costello were subsequently reversed by the Supreme Court on the basis of their erroneously expansive interpretation of § 2281. Morales v. Turman, 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977) (per curiam); Costello v. Wainwright, 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977) (per curiam). In Morales, the Supreme Court emphasized that the three-judge court mechanism is "not a measure of broad social policy to be construed with great liberality, but ... an enactment technical in the strict sense of the term and to be applied as such." 430 U.S. at 324, 97 S.Ct. at 1190. Since the plaintiffs in Morales had not claimed that any state statute or regulation was unconstitutional *727 as such, their broad attack upon the state's policies and practices did not satisfy the necessary prerequisites for the convening of a three-judge court under § 2281.
In Costello, the Supreme Court ruled that the Court of Appeals was wrong to view "[t]he possible temporary suspension of an otherwise valid state statute to effectuate federally mandated relief as equivalent to finding that statute unconstitutional." 430 U.S. at 326, 97 S.Ct. at 1192. The Supreme Court proceeded to present its definitive interpretation of the three-judge court statute:
The applicability of § 2281 as written turns on whether a state statute is alleged to be unconstitutional, not on whether an equitable remedy for unconstitutional state administrative behavior ultimately impinges on duties imposed under concededly constitutional state statutes.
Id. Since the plaintiffs in Costello did not assert the unconstitutionality of any state statute, the fact that the corrective steps necessary to relieve unconstitutional conditions of confinement might supersede existing provisions of state law was not sufficient to warrant the application of § 2281.
The Supreme Court's rejection of the Fifth Circuit's attempt to equate unconstitutional practices with unconstitutional laws for three-judge court purposes did not originate with Morales and Costello. Some seven years earlier, in Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), the Court noted the importance of maintaining such distinctions under § 2281. The line of delineation, the Court held, "falls between a petition for injunction on the ground of the unconstitutionality of a statute, either on its face or as applied, which requires a three-judge court, and a petition seeking an injunction on the ground of the unconstitutionality of the result obtained by the use of a statute not attacked as unconstitutional [which does not]." 396 U.S. at 353-54, n. 10, 90 S.Ct. at 536-37, n. 10. (Emphasis in original.)
Other courts, both before and after the Supreme Court's decisions in Morales and Costello, have stressed that a three-judge court is appropriate only if a state statute is directly under attack. In Cooper v. Aaron, 261 F.2d 97 (8th Cir. 1958) (per curiam), affirmed 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), the Court of Appeals faced an attempt to enforce a school desegregation order in Little Rock, Arkansas, in the face of newly-enacted state statutes authorizing the governor to close down the schools. In rejecting the contention that such a claim was cognizable only in a three-judge court, the Court of Appeals observed:
Acts of state officials, which otherwise constitute a violation of federal law, or which are on other federal grounds legally improper in their relation to a particular situation, may afford the basis for an injunction without regard to the validity of the state statute underlying them. A three-judge court is not required for the issuance of such an injunction.
261 F.2d at 106. In Spain v. Procunier, 600 F.2d 189 (1979), the Court of Appeals for the Ninth Circuit concluded that a three-judge court was unnecessary to consider a conditions of confinement suit similar in nature to Costello and Morales. The proper interpretation of § 2281 has not been thoroughly addressed by the Court of Appeals in this circuit since the release of the ill-fated Morales and Costello decisions in 1976.
Under all of the viable precedent, it is apparent that no three-judge court was required to hear plaintiffs' constitutional challenge to the policies and practices of the Texas Education Agency and other state officials in this case. One searches the plaintiffs' pleadings and the pre-trial order in vain for any contention that the state's existing bilingual statute violates the Fourteenth Amendment or any other provision of the Constitution. Surely the constitutional validity of Senate Bill 477, a new piece of bilingual education legislation enacted after the judgment in this case, could not have been at issue when the trial was held in 1979. As in Costello and Morales, plaintiffs here complain of unconstitutional policies carried out by the state. While the *728 relief sought may conflict to some extent with provisions of state law, that discrepancy, the Supreme Court has made clear, does not warrant the convening of a three-judge court where no direct attack upon the constitutionality of state law has been levied. It would be particularly inappropriate to expand the parameters of § 2281 in this unjustifiable fashion in light of the repeal of that statute by Congress in 1976.[11]

F. Conclusion.

The procedural history of this case demonstrates conclusively that the defendants' failure to remove the vestiges of unconstitutional discrimination under the Equal Protection Clause was placed in issue. Under applicable legal standards, the pre-trial order, which alluded repeatedly to that constitutional violation, supplanted all prior pleadings and served as the governing pattern of the case at trial. The actions undertaken by defendants' counsel before, during, and after the trial constituted implied consent to include the Equal Protection issue within the scope of the litigation. Defendants suffered neither surprise, prejudice, nor a deprivation of due process by the court's consideration of their constitutionally deficient practices and formulation of an appropriate remedy. Even if the constitutional issue had been outside the bounds of the case, the fact of defendants' past intentional discrimination against Mexican-American students was properly encompassed within plaintiffs' statutory claims. The remedial injunction issued on April 17, 1981, was warranted, not only by defendants' unconstitutional conduct, but by their statutory violations as well.
Although the constitutionality of defendants' policies and practices was properly before the court, that claim did not meet the prerequisites for referral to a three-judge court. Specifically, plaintiffs did not attack the constitutionality of any state statute or regulation. Under the Supreme Court's narrow interpretation of 28 U.S.C. § 2281, the three-judge statute repealed in 1976, the absence of such a direct constitutional challenge to a statute rendered the case ineligible for submission to a three-judge court. For all of these reasons, defendants' motion to vacate the remedial order and withdraw the memorandum opinion previously entered in this case is wholly devoid of merit and shall be denied.

IV. MOTION FOR STAY PENDING APPEAL.

A. Applicable Legal Standards.

The third motion filed by defendants on July 6, 1981 seeks a stay of the *729 remedial order, in its entirety, pending their appeal of that order. The suspension or granting of equitable relief by a district court during the pendency of an appeal is authorized by Rule 62(c), F.R.Civ.P.:
When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.
The party who makes such a motion effectively asks the court to delay the implementation of its decision until the court of appeals has had an opportunity to consider the validity of that ruling. Since such an action interrupts the ordinary process of judicial review and postpones relief for the prevailing party at trial, the stay of an equitable order is an extraordinary device which should be sparingly granted. Atlantic Richfield Co. v. Federal Trade Commission, 398 F.Supp. 1, 17 (S.D.Tex.1975), aff'd. 546 F.2d 646 (5th Cir. 1976); see also F.M.C. v. New York Terminal Conference, 373 F.2d 424, 426 (2nd Cir. 1967). The burden of proof is on the movant to demonstrate that the issuance of a stay pending appeal is warranted. Drummond v. Fulton County Dept. of F.&C. Services, 532 F.2d 1001, 1002 (5th Cir. 1976) (per curiam).
These general precepts governing requests for interlocutory stays are underscored when relief has been ordered to remedy constitutional violations, particularly in the field of public education. Constitutional rights are warrants for the here and now, to be promptly fulfilled in the absence of "an overwhelming compelling reason". Watson v. Memphis, 373 U.S. 526, 533, 83 S.Ct. 1314, 1318, 10 L.Ed.2d 529 (1963). Where vestiges of unconstitutional discrimination remain, the clear and compelling duty of the judiciary is to institute meaningful relief which will work immediately to eliminate the effects of past illegality and assure future compliance with the laws of the land. Green v. County School Board, 391 U.S. 430, 438, n.4, 88 S.Ct. 1689, 1694, n.4, 20 L.Ed.2d 716 (1968); United States v. DeSoto Parish School Board, 574 F.2d 804, 811 (5th Cir. 1978), cert. denied, 439 U.S. 982, 99 S.Ct. 571, 58 L.Ed.2d 653.
For these reasons, the Supreme Court and the individual Justices sitting as Circuit Justices have consistently denied stays and reversed stays granted by courts of appeals from relief ordered in school desegregation cases. E.g. Swann v. Charlotte-Mecklenburg Board of Ed., 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed.2d 791 (1971); Carter v. West Feliciana Parish Board, 396 U.S. 266, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969); Winston-Salem/Forsyth Board of Ed. v. Scott, 404 U.S. 1221, 92 S.Ct. 1236, 31 L.Ed.2d 441 (1971) (Burger, Ch.J., in chambers); and cases cited in Morgan v. Kerrigan, 523 F.2d 917, 921 (1st Cir. 1975) (per curiam). In most of these cases, the moving party contended that the administrative burden of implementing relief outweighed the need for immediate vindication of the constitutional rights of school children affected by unlawful discrimination. That argument has almost invariably been rejected. As the Court of Appeals for the Sixth Circuit declared in Reed v. Rhodes, 549 F.2d 1050, 1052 (1976), "the value of the constitutional rights to be protected [in such circumstances] far outweighs administrative costs that might be incurred in formulating a remedy ...."
Against this backdrop, the Court of Appeals has heretofore articulated four specific conditions which must be satisfied by the party seeking a stay of an injunction pending appeal. First, the movant must show a probability of success on the merits. Second, he must show that he will suffer irreparable injury unless the requested stay is granted. Third, he must demonstrate that no substantial harm will befall the other parties in the case should the stay issue. Finally, the movant must show that the stay of equitable relief will serve the public interest. Coastal States Gas Corp. v. Department of Energy, 609 F.2d 736 (5th Cir. 1979) (per curiam); Fortune v. Molpus, 431 F.2d 799, 804 (5th Cir. 1970); Pitcher v. Laird, 415 F.2d 743, 744-45 (5th Cir. 1969); *730 Belcher v. Birmingham Trust Nat. Bank, 395 F.2d 685 (5th Cir. 1968); Corpus Christi Peoples' Baptist Church, Inc. v. Texas Dept. of Human Resources, 481 F.Supp. 1101, 1112 (S.D.Tex.1979), affirmed mem. 621 F.2d 438 (5th Cir. 1980).
In a recent decision, the Court of Appeals appears to have realigned these four conditions for the purpose of determining whether a stay ought to issue pending appeal. Ruiz v. Estelle, 650 F.2d 555, 565-66 (5th Cir. 1981). Stressing the pivotal importance of determining the equities in ruling upon a motion for stay, the Court of Appeals grouped the three equitable conditions (irreparable harm, effect on other parties, public interest) together, contrasting them with the fourth condition (probability of success on the merits). The court held that when the balance of the equities weighs heavily in favor of granting a stay, the movant need only present a "substantial case on the merits", rather than a probability of success on appeal. Id. at 565. Under the analytical framework set out in Ruiz, it is appropriate to determine initially whether or not movant has satisfied the three equitable conditions to warrant the issuance of a stay.

B. Irreparable Harm Suffered by Defendants.

Defendants claim in their motion for stay that the implementation of the remedial decree during the 1981-82 school year would result in "chaos and disorder", while imposing "onerous" administrative and fiscal burdens upon the Texas Education Agency and local school districts throughout the state. It would be "counterproductive", defendants maintain, to institute relief at this time. Indeed, they conclude, it would be "impossible" to carry out the remedial decree entered on April 17, 1981.
Most of these ominous predictions are contradicted by other representations made by defendants in their motion for stay and related motions. Defendants emphasize repeatedly that the enactment of bilingual education legislation by the Texas Legislature, signed into law on June 12, 1981, has rendered the court's remedial order largely superfluous. In their motion to vacate that order, defendants asserted:
The statutory provisions are quite similar to this Court's order for identification and assessment of limited English proficiency children, entry criteria, exit criteria, language proficiency assessment committee procedures, facilities, monitoring, and enforcement.
Defendants' Motion to Vacate Order (July 6, 1981) at 5. Those topics comprise the bulk of the remedial order itself. "In some respects," defendants noted, "the statute goes further than the order. For example, bilingual programs are required to be implemented in grade 6 for the 1981-82 school year instead of 1982-83 as specified in the order." Id.
Once the defendants' hyperbolic rhetoric is penetrated, their claim of irreparable harm is based largely upon the impact of the remedial order upon those school districts with fewer than twenty LEP [limited English proficiency] students in a single grade. As the defendants point out,
[t]he only children with respect to whom the Court has ordered provision of bilingual education in 1981-82 who are not required to be provided bilingual education under Senate Bill 477 are those who attend schools in districts which do not have 20 or more limited English proficiency students in one grade.
Defendants' Motion for Stay (July 6, 1981) at 17. Defendants go on to suggest that the number of such districts to be directly affected by the remedial order during the forthcoming school year is likely to diminish, since "the new statutory procedures concerning identification, monitoring, and compliance will result in accurate counts of limited English proficiency students which may push an undetermined number of districts over the 20 threshold." Id. at 18. Even those districts which remain under that numerical threshold, and thus would not be required to provide bilingual instruction under the newly-enacted state law, are offered significant economic incentives by that statute to do so. The statute also *731 offers a strong incentive to districts with bilingual programs to admit students from neighboring districts where such programs do not exist. It is only those districts falling under the numerical threshold and resisting the statutory incentives that can claim any impact from the scope of bilingual instruction mandated by the remedial decree for 1981-82.
Those districts, under the decree, are authorized to provide bilingual instruction in a variety of ways, according to their specific circumstances. A district may combine with other districts in establishing a joint bilingual program. It may choose to create a single bilingual class, consolidating students from two consecutive grades. If a district can show that both of these alternatives would be impractical, it may establish, in lieu thereof, a program utilizing team teaching, individual tutoring, or any other approach which the district deems appropriate. With such a plethora of options available to these districts, it is implausible that they will suffer irreparable harm in attempting to meet the same educational needs of LEP students which are being addressed by all other school districts throughout the state.
Defendants also maintain that school districts required to institute bilingual programs under the remedial decree will be unable to find sufficient teaching personnel to staff the programs. Yet those districts, by definition, will conduct comparatively small programs, requiring limited staffing. In the event that some local districts do encounter difficulty in locating an adequate number of certified bilingual teachers to staff required programs during the 1981-82 school year, the order authorizes such districts to apply to the TEA for a temporary deviation which will permit the hiring of a teacher with an emergency bilingual certification in lieu of a regularly-certified teacher. The TEA is authorized to issue emergency certifications as needed to local districts which make the requisite showing. In the event that a school district is unable to locate a sufficient number of Spanish-speaking teachers, emergency certification may be granted to teachers who do not speak Spanish on a temporary basis, if they are enrolled in a bilingual training program. These flexible staffing provisions ensure that every local school district will be able to expand the scope of their bilingual programs without undue hardship. The bilingual staffing report to be filed by local districts by August 1, 1981, is a concise document which will aid the TEA in coordinating the bilingual programs throughout the state.
Recognizing that the remedial decree contains ample provisions by which a district may secure administrative authorization to deviate from the general requirements on a temporary basis if necessary, defendants contend that applying for such variances would impose an onerous administrative burden upon local districts. The processing of such applications, defendants maintain, would overwhelm the resources of the TEA. These gloomy forecasts are wholly unsubstantiated. Defendants have introduced no evidence on how many districts will require deviations; how much energy they must expend in filing their applications; or how much time and money the TEA will require to process them. Both school districts and the TEA have considerable experience with the emergency teaching certification procedure and with numerous other administrative chores which have become an integral part of operating a public education system. In any event, these speculative administrative burdens do not even approach the standard of irreparable injury which would justify the postponement of meaningful relief for the victims of unconstitutional discrimination.
Defendants enumerate several other types of irreparable harm which they contend will result unless the remedial decree is stayed pending appeal. None of these allegations of injury satisfy the defendants' burden of demonstrating that a stay should issue. First, defendants assert that uncertainty will exist over how to proceed in those areas where the court's order and state law are in conflict. That question would appear to be settled by the Supremacy Clause, Article VI, § 2 of the Constitution, *732 which provides that federal law, as the "supreme Law of the Land", shall prevail. While an ambiguous or possible conflict might require clarification by the court, such a situation would hardly inflict irreparable harm upon the defendants.
Second, defendants argue that parents of limited English proficiency students in the elementary grades who desire to prevent their children from receiving bilingual instruction in 1981-82 will suffer irreparable harm under the remedial order, which does not authorize such parents to withdraw their children from bilingual programs. Defendants, who do not purport to represent any such parents, offer no evidence that such persons in fact exist. Thus, the alleged harm is of the most hypothetical and contingent nature. Moreover, the defendants have presented no evidence that bilingual instruction could be hazardous to these children or to their parents. On the contrary, defendants have consistently acknowledged that bilingual instruction is an effective learning tool for children with other native languages. Under the state's own law, in effect at the time of trial, parents were not permitted to withdraw their children from bilingual programs. Not only is the purported harm wholly unsubstantiated, but defendants have themselves been perpetrating the "injury" they now protest upon the parents of LEP students for nearly a decade. Defendants' claim in this regard is entitled to little weight.
Third, defendants charge that the requirement that TEA regulations promulgated pursuant to the decree be approved by the court before taking effect "may lead to chaos and disorder". No documentation is presented to support this dire warning. The preclearance procedure is hardly a novel one. It shall be carried out in a quick and efficient manner, in order to minimize resulting delays within the administrative process. There is no basis to assume that any harmful consequences will result from the implementation of this oversight mechanism.
Finally, defendants point out that the public will probably react negatively to the implementation of the remedial decree, seemingly suggesting that the decree should be stayed in order to ward off such adverse criticism. This is a curious argument, implying that federal courts should consult public opinion, rather than the Constitution and laws of the United States, before rendering judgment. A similar argument was made by the applicants for a stay of the school desegregation order in Keyes v. Denver School District Number One, 396 U.S. 1215, 90 S.Ct. 12, 24 L.Ed.2d 27 (1969) (Brennan, J., in chambers). There, the Court of Appeals had issued a stay, in order to attempt to secure the voluntary cooperation of the local residents. But Justice Brennan vacated the stay, declaring: "[t]he desirability of developing public support for a plan designed to redress de jure segregation cannot be justification for delay in the implementation of the plan." Id. at 1217, 90 S.Ct. at 13. Although this court would welcome widespread public approval of the remedial decree in this case, that preference must give way to the imperative that victims of unconstitutional discrimination be accorded prompt and effective relief, whether popular or not.
In summary, defendants have failed to demonstrate that any elements of relief to be implemented during the 1981-82 school year, the likely period of the pendency of their appeal, will cause them to suffer irreparable harm. Many of the remedial measures, by defendants' own admission, are already mandated by the newly-enacted bilingual education legislation signed into law on June 12, 1981. School districts with smaller numbers of LEP students, exempt from bilingual education requirements under state law but encompassed within the remedial order, are accorded a flexible range of program options along with a mechanism to secure administrative deviations should they be needed. All of the other allegations of irreparable harm are wholly unsupported or devoid of substance. Accordingly, defendants have fallen far short of satisfying their burden on this *733 first, crucial prerequisite to obtaining a stay pending appeal.

C. Substantial Harm to Other Parties.

Although the recently-enacted statute relating to bilingual education significantly ameliorates the deficiencies of the state's existing instructional programs for LEP students, it fails to provide adequate or complete relief. First, the legislation does not prescribe eligibility criteria for receiving bilingual instruction. Although some suggested guidelines are set out, unfettered discretion is vested in the State Board of Education to promulgate specific standards. Thus, there is no assurance that the thousands of LEP students denied bilingual instruction under the state's existing program will be any better off under the new legislation.
Second, the statute allows the state education agencies more than two years in which to prepare a plan to recruit and train an adequate number of teachers to staff bilingual programs. Yet by the defendants' own admission, there is a present shortage of certified bilingual teachers in the State of Texas which merits immediate attention. Until this fundamental problem is addressed, significant expansion of bilingual programs within the state cannot be carried out. Accordingly, a detailed plan for the recruitment and training of new bilingual staff must be prepared and implemented long before September, 1983, the date specified in the statute.
Third, and probably most important, the legislation continues to exempt all school districts with fewer than twenty LEP students in any one grade from the obligation to provide bilingual instruction or any other program to meet the special needs of such students. Thus, state law leaves LEP students in districts falling below the numerical threshold without any means to overcome the effects of prior discrimination or remove language barriers to equal educational opportunity. For the thousands of such children throughout the state, the relief afforded by the new legislation is little more than an empty promise of reform.
The discrepancies between the bilingual legislation enacted on June 12, 1981, and the remedial decree in this case entered on April 17, 1981, support the immediate implementation of that decree. The granting of a stay, as requested by defendants, would necessarily postpone the inception of meaningful relief for tens of thousands of Mexican-American children with limited proficiency in English for at least one year. Even if the Court of Appeals were to render a decision within the next six months, no affirmative remedial steps under the decree could be undertaken until the beginning of the following school year, 1982-83. The equitable relief ordered in this case, to be phased in over the next six years, will likely take far longer than that to extirpate remaining vestiges of de jure discrimination against Mexican-Americans in the Texas public schools. The more promptly the process begins, the sooner it will accomplish its remedial purposes.
Defendants have presented no compelling justification for further delay. The school children whose rights are at issue in this case deserve to be accorded the special help they need to overcome the disabilities imposed by past discrimination as quickly as possible. Postponing the commencement of equitable relief for an additional year, while the case is considered by the Court of Appeals, would irreparably harm the plaintiffs and the students they represent, to a degree which far exceeds any burden which may be imposed upon the defendants.

D. Harm to Public Interest.

Although the remedial order entered in this case may engender some controversy, the staying of that order would undoubtedly be contrary to the public interest. This nation has committed its energies towards the elimination of discrimination based upon race or national origin, and to providing access to social and economic opportunity for all on an equal basis. The Mexican-American school children involved in this case bear a legacy of prejudice and injustice, suffered by their forebears in Texas for more than a century. The scars of that *734 tragic history, manifested in part by an educational disability, will not disappear until affirmative measures are undertaken to repair the damage. It is in the interest of the public to start that process without further delay to overcome the vestiges of past discrimination, and to provide Mexican-American children with the educational tools they need to fulfill the promise of American life. Equal opportunity, mandated by the Constitution, must be accorded all citizens if it is to have any real meaning. Postponing relief in this case for a year or more will merely perpetuate the proven evils of past discrimination, to the detriment of all Americans.

E. Likelihood of Success on the Merits.

The defendants' failure to satisfy the equitable conditions for a stay pending appeal renders their likelihood of success on the merits rather academic. While the recent decision of the Court of Appeals in Ruiz permits the issuance of a stay absent a showing of probability of success on appeal where the balance of equities weighs heavily in movant's favor, that decision does not authorize the granting of a stay where the equitable conditions have not been met. Moreover, the position of this court on the merits of plaintiffs' claims has been amply set out in the previously-entered memorandum opinion and remedial decree and need not be reiterated in detail herein. Nevertheless, since likelihood of success on appeal remains one of the four fixed criteria for disposing of a motion for stay, discussed at length by defendants and plaintiff-intervenors in their written submissions, a brief consideration of that question is warranted.[12]

1. Constitutional Violation and Remedy.
Defendants' primary argument that they will prevail on the merits of their appeal is that the Equal Protection violation addressed by the memorandum opinion and remedial decree was not properly within the scope of the litigation. As conclusively demonstrated in Section III, supra, that argument is without merit. There is no basis for assuming that the Court of Appeals will not conclude, after scrutinizing the entire record, that the constitutional issue was litigated in accordance with the final pre-trial order and by the implied consent of the parties.
Evidence of purposeful discrimination endured by Mexican-American children in public schools throughout the State of Texas was overwhelming and uncontested at trial. The record revealed numerous forms of discrimination, including the maintenance of segregated school for Mexican-American students, the provision of inferior equipment and materials to such schools, and the enforcement of laws and regulations prohibiting Mexican-American students from using their native language on school grounds. Indeed, defendants stipulated to the pervasive history of intentional discrimination alleged by plaintiffs.
Plaintiffs demonstrated that this past discrimination had effectively imposed an educational disability or handicap upon Mexican-American students in the Texas public schools. The state defendants failed to meet their burden of proving that the same results would have occurred absent purposeful discrimination. See Mt. Healthy City Bd. of Education v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). On the contrary, defendants conceded the adverse impact of their past policies towards Mexican-American school children.
The defendants' principal response to plaintiffs' allegations was that the state was taking adequate steps to overcome the damage caused by past discrimination. Most of the evidence heard at trial pertained to the adequacy or inadequacy of the state's current program for educating Mexican-American students with limited proficiency in English. The overwhelming weight of that evidence, described in detail in the memorandum opinion entered by this *735 court on January 9, 1981, demonstrated the gross deficiencies in the existing program, particularly with respect to the scope of bilingual instruction, criteria for determining eligibility for such instruction, and monitoring compliance with applicable laws and regulations. The court's conclusion that the defendants had failed to remedy their unlawful discrimination against Mexican-American students was amply documented and, indeed, unavoidable in light of the evidentiary record. It appears unlikely that the Court of Appeals will reach a different conclusion after examining that same record.
The equitable relief ordered on April 17, 1981, was tailored to fit the scope of this constitutional violation. Both the Supreme Court and the Court of Appeals for the Fifth Circuit have recognized the appropriateness of affirmative remedial measures to overcome the effects of past discrimination in the field of education. E.g. Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II); United States v. Jefferson County Bd. of Education, 372 F.2d 836, 900 (5th Cir. 1966), cert. denied 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). See also Evans v. Buchanan, 582 F.2d 750, 767-69 (3rd Cir. 1978) (en banc), aff'd mem. 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980). Incomplete remedies which fail to eradicate all vestiges of discrimination have been consistently disapproved. E.g. Lee v. Macon County Bd. of Education, 616 F.2d 805 (5th Cir. 1980). The primary requirement for equitable relief is that it will be effective in accomplishing its remedial purpose. Dayton Bd. of Education v. Brinkman, 443 U.S. 526, 538, 99 S.Ct. 2971, 2979-80, 61 L.Ed.2d 720 (1979) (Dayton II). The remedial decree entered in this case adheres closely to these established principles of equitable relief, while according the greatest possible degree of autonomy to the defendants in fulfilling their responsibilities under state law. Although the Court of Appeals might conceivably disagree with this court as to the propriety of one or more specific elements of relief, there is little likelihood that the defendants will succeed in overturning the bulk of the decree.

2. Violation of 20 U.S.C. § 1703(f) and Remedy.
Defendants contend that the court erroneously decided plaintiffs' claim under section 204(f) of the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1703(f). That statute makes it unlawful for an education agency to fail to take "appropriate action to overcome language barriers that impede equal participation by its students in its instructional programs." Defendants base their argument upon their interpretation of the recent decision by the Court of Appeals in Castaneda v. Pickard, 648 F.2d 989, No. 79-2253 (5th Cir. 1981). In defendants' view, neither the finding of a § 1703(f) violation nor the remedial measures prescribed were consistent with the proper construction of the statute, as explicated by Castaneda.
Although this court did not have the benefit of the Castaneda decision in framing its memorandum opinion this past January, the evidentiary record in this case clearly made out a violation of § 1703(f) under the three-step analysis approved by the Court of Appeals. The initial determination which must be made under the Castaneda formula is whether the challenged educational program is informed by an educational theory recognized as sound by some experts. At 1009. The program conducted in the Texas public schools, under the auspices and regulations of the TEA, was explored in detail at trial. As explained more fully in the memorandum opinion, that program consists of bilingual instruction for some LEP students and special instruction in English as a second language (ESL) for others. Those students receiving ESL spend as little as one hour per day in improving their proficiency in English. The remainder of the school day is spent in regular classes conducted wholly in English, where the LEP student may understand little, if any, of what is transpiring. There was no evidence that students receiving ESL in lieu of bilingual instruction were ever accorded supplemental or compensatory learning assistance *736 to remedy deficiencies in academic subjects which may have developed while they were ostensibly concentrating on learning English.
Plaintiff-intervenors presented a number of witnesses at trial who testified to the theoretical deficiencies of the ESL program as practiced within the Texas public schools. Those expert witnesses included Professor Courtney Cazden of Harvard University; Dr. Rudolph Troike, former Director of the Center for Applied Linguistics at Georgetown University; Dr. John McFarland, Dean of Texas Women's University; and Dr. Angel Gonzalez, Director of the Bilingual Program in the Dallas Independent School District. These and other witnesses testified that, as a matter of educational theory, the limited ESL program operating throughout the State of Texas failed to provide LEP students with the tools necessary to overcome language barriers and enter the mainstream of the public education system on an equal basis.
Defendants did not present evidence to contradict this theoretical attack upon its educational program. On the contrary, both Dr. Robert Tipton of the TEA, who testified at trial, and Dr. Jesus Zamora, a TEA consultant who testified by deposition, conceded that the bilingual instruction model was superior to the limited ESL program employed throughout the state. Some expert support might have been found for a program based upon intensive ESL instruction on a full-time basis, followed by remedial instruction in academic subjects once proficiency in English was achieved, but there was no evidence that such a program was in effect in any school district operating under the auspices of the TEA. On the basis of the evidentiary record, the theoretical deficiencies of the state's ESL program, enumerated in the memorandum opinion, were readily apparent.
The second prong of the Castaneda test to determine the existence of a § 1703(f) violation is whether a theoretically sound instructional program is being provided with the resources, personnel, and other necessities to transform the theory into reality. At 1009. In this case, since the defendants' limited ESL program was theoretically deficient, there was no need to reach that inquiry. In any event, proof was overwhelming at trial, as well as in the extensive documentary evidence, that noncompliance with the TEA's regulations concerning the operation of this program on a local basis was widespread. As for the bilingual element of the state's program, restricted to the lowest grade levels, it was uncontested that the TEA's own monitoring revealed extensive deficiencies in program content, staffing, and identification of LEP students. According to TEA's own estimate, nearly 100,000 LEP students were receiving no special instruction of any kind. Thus, a violation of § 1703(f) was clearly made out under the second criteria set forth in Castaneda as well.
Finally, if the preceding two requirements have been met, the Court of Appeals requires the fact-finder to determine whether the challenged program, as actually implemented, is failing to accomplish its purpose by overcoming the language barriers it was designed to address. At 1010. The abysmal results of the defendants' efforts to date are chronicled in detail in the memorandum opinion and need not be restated here. A clearer example of failure could hardly be conceived. Moreover, there was absolutely no evidence that the results of the state's program were beginning to improve or were likely to do so in the years ahead. Although the defendants have altered their programs for LEP students to some extent each year during the past decade, these modifications have not changed the overall thrust of their approach to the problem. The defendants' existing program has had ample time to work, but it has failed to do so. Therefore, it does not constitute "appropriate action" under any of the three prongs of the Castaneda formula.[13]
*737 Defendants argue that even if they have violated the provisions of § 1703(f), the remedial measures prescribed by the court are barred by the Court of Appeals' decision in Castaneda. This argument confuses the elements of a statutory violation with the elements of relief for that violation, grossly misconstruing the Castaneda decision. The section of that decision pertaining to § 1703(f) exclusively addresses the question of how to determine whether a violation of the statute has occurred. The three-pronged analytical test, described above, is the Court's innovative answer to that question. The issue of determining an appropriate remedy, should a violation of § 1703(f) be discerned, is never addressed in Castaneda, either directly or by implication.
The difference between wrongdoing and remedy in this context is all-important. The Court emphasizes that in the first instance, an education system should be free to adopt any appropriate program of instruction "so long as the schools design programs which are reasonably calculated to enable these students to obtain parity of participation in the standard instructional program within a reasonable length of time after they enter the school system." at 1011-12. Thus, the Court holds, bilingual instruction is not the only acceptable approach to meeting the needs of LEP students under § 1703(f). Instead, an education agency could choose to focus first on the development of English language skills through an intensive ESL program, and subsequently provide students with compensatory and supplemental education to enable them to catch up in substantive academic areas. Id.
But the evidence in this case reveals that the defendants adopted neither of these two lawful approaches. Instead, they were operating a hybrid program consisting of insufficient ESL instruction for some students and inadequately staffed bilingual instruction for others. Apart from the failure of this program to satisfy any of the three standards set out in Castaneda, the defendants' approach also neglected the separate duty, imposed by the Court of Appeals, to provide LEP students with supplemental assistance in academic subject areas so that they will not incur irreparable educational deficits during the period they are learning English. At 1011, 1014. Thus, the defendants strayed outside the limited sphere of permissible action afforded them under Castaneda.
After a statutory violation of § 1703(f) has been detected, Castaneda surely does not suggest that the courts lack power to institute measures which will remedy that illegality and bring the miscreants into compliance. Neither Castaneda nor any other legal precedent limits relief to a declaratory judgment of wrongdoing, leaving the eradication of illegality to the unfettered discretion of those who have been found in violation of the law. On the contrary, under well-established principles of equitable relief, the remedial decree must be carefully tailored to address the specific violation which has been found, redressing the consequences of illegality. E. g. Swann v. Board of Education, 402 U.S. 1, 15-16, 91 S.Ct. 1267, 1275-76, 28 L.Ed.2d 554 (1971). The relief ordered in this case abides by those equitable principles. It is simply too late for the defendants to contend that they should be accorded the discretion to take *738 measures of their own choosing in order to remedy their unlawful conduct. Under our legal system, appropriate relief is determined by the judiciary, not by the parties who broke the law. The portion of Castaneda setting out the elements of a § 1703(f) violation in no way conflicts with the elements of relief contained within the remedial decree to redress a proven violation of that statute.[14]

3. Other Substantive Issues Raised by Defendants.
Defendants raise an assortment of other arguments on the merits which warrant less extensive treatment. First, they maintain that any judicial relief designed to redress the statutory violation of 20 U.S.C. § 1703(f) has been mooted by the enactment of S.B. 477 on June 12, 1981. Unfortunately, as noted above, the new bilingual education statute fails to alter the defective theory which underlies the state's limited ESL program or to address other deficiencies rectified by the remedial decree. While the implementation of the statute will overlap, to some extent, with elements of relief provided by the remedial decree, that decree has hardly been rendered superfluous. If the new legislation actually provided all of the necessary relief encompassed within the court's order, it is difficult to understand how the defendants could contend that the implementation of that order will cause them to suffer irreparable harm.
Second, defendants contend that the elements of relief set forth in the remedial decree will be impossible to carry out. The decree, defendants assert, therefore violates 20 U.S.C. § 1713(g), which requires that any plan to remedy a denial of Equal Protection or equal educational opportunity be "educationally sound and administratively feasible". It is unlikely that the cited statute, applicable by its terms only to remedies involving "the transportation of students" and enacted as an "anti-busing" amendment to the Equal Educational Opportunities Act of 1974, applies to the type of compensatory instructional relief provided in this case. Moreover, § 1713(g) must be read in the context of another provision of the same Act, § 1702(b), which provides that "the provisions of this chapter are not intended to modify or diminish the authority of the courts of the United States to enforce fully the fifth and fourteenth amendments of the United States." Thus, at least as to the constitutional violation determined to have been committed, this court was necessarily guided by established principles of equitable relief, as set out in the memorandum opinion.
Finally, and most importantly, defendants have presented no credible evidence that the remedial decree is either unfeasible or educationally unsound. The scope of bilingual instruction is to be gradually expanded over a period of six years, accompanied by the implementation of a concerted plan to recruit and train new bilingual teachers. Although defendants speculate that insufficient staffing for required bilingual programs will be available, that calamitous prediction is wholly unsubstantiated. As already noted, should any school district have difficulty locating certified bilingual teachers to staff its programs, emergency certification by the TEA and other interim measures are explicitly authorized by the decree. Thus, the relief ordered in this case is fully compatible with the provisions of § 1713(g).
Third, defendants complain that they were not given a sufficient amount of time in which to devise a voluntary plan of relief for their unlawful conduct prior to the entering of a remedial order. Defendants rely upon 20 U.S.C. § 1758, which provides, in pertinent part, that no desegregation plan shall be entered until the affected educational agency "has been provided notice of the details of the violation and *739 given a reasonable opportunity to develop a voluntary remedial plan." This provision, like § 1713 of the same Act, was added on the floor of Congress as part of a set of anti-busing amendments to the Equal Educational Opportunities Act. Its applicability to relief designed, not to desegregate, but to eradicate the lingering effects of past discrimination, is highly doubtful.
In any event, defendants were accorded an adequate opportunity to formulate a voluntary plan to remedy the specific violations of law enumerated in the court's memorandum opinion of January 9, 1981. The order accompanying that memorandum opinion gave the parties two full months in which to submit their proposed plans of relief to the court. Defendants submitted their plan, some eighteen days after the deadline, on March 27, 1981. That plan fell lamentably short of addressing the defendants' unlawful conduct. On March 18, 1981, and on April 17, 1981, defendants were denied additional time in which to file a remedial plan. The reasons for that denial are set out in those written orders, part of the record in this case, and need not be reiterated here. It is enough to point out that defendants made little use of the ten weeks which elapsed between the entry of the memorandum opinion on January 9, 1981, and their submission of a totally unacceptable plan on March 27, 1981.
Finally, some nine years after the complaint in intervention was filed in this case and more than eighteen months after the conclusion of trial, defendants assert, for the first time, that the more than one thousand local school districts operating under the auspices of the TEA throughout the State of Texas should have been made party-defendants. This case, from beginning to end, has been litigated as a statewide challenge to the programs and practices of the TEA and other state defendants, implemented at the local level through local education agencies. Under state law, the Central Education Agency, including the State Board of Education, formulates and implements educational policy throughout the state. Tex.Educ.Code Ann. §§ 11.02, 11.24, 11.25, 11.27 (Vernon 1972). The extent to which pervasive discrimination against Mexican-Americans in the Texas public schools was supported by state policies and funding is detailed in the memorandum opinion. 506 F.Supp. at 412. Under such circumstances, the state education agencies, specified as defendants herein, are the proper parties to this suit. See Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967) (three-judge court), affirmed sub nom. Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422 (1967).
Defendants further contend that a statewide remedy is inappropriate in the absence of evidence that past discrimination against Mexican-American students and denial of equal educational opportunity has existed within each and every local school district throughout the state. This argument disregards the well-established doctrine that proof of purposeful discrimination in a substantial part of a school system furnishes a sufficient basis for an inferential finding of systemwide illegality unless rebutted by credible evidence. Dayton Board of Education v. Brinkman, 443 U.S. 526, 535, 99 S.Ct. 2971, 2977, 61 L.Ed.2d 720 (1979) (Dayton II); Columbus Board of Education v. Penick, 443 U.S. 449, 458, 467, 99 S.Ct. 2941, 2947, 2951, 61 L.Ed.2d 666 (1979); Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 203, 93 S.Ct. 2686, 2695, 37 L.Ed.2d 548 (1973). In this case, defendants presented no evidence that even a single district within the state was complying with its obligations under the Constitution and laws of the United States. The Court of Appeals and the district courts have repeatedly found unlawful discrimination against Mexican-Americans in the State of Texas in the field of education, both in individual districts and throughout the state. E. g., United States v. Texas Education Agency, 600 F.2d 518 (5th Cir. 1979) (Lubbock Independent School District); United States v. Texas Education Agency, 564 F.2d 162 (5th Cir. 1977), cert. denied, 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979) (Austin III); Morales v. *740 Shannon, 516 F.2d 411, 413 (5th Cir. 1975), cert. denied, 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1976) (Uvalde public schools); United States v. Midland Independent School District, 519 F.2d 60, 64 (5th Cir. 1975); United States v. State of Texas, 498 F.Supp. 1356 (E.D.Tex.1980) (state-wide discrimination found). Moreover, the record contained evidence of specific illegal conduct and program inadequacies in dozens of individual school districts throughout the state.
As a practical matter, it would be virtually impossible for a court to review the specific facts and circumstances in more than a thousand individual school districts in the context of a systemwide attack upon educational policies and practices such as this. The so-called "Keyes presumption", where warranted by the evidence, serves to render such a task unnecessary. The evidentiary burden is accordingly shifted to the defendants or individual school districts to demonstrate that they have not violated the law. No such demonstration was made, or even attempted, during the long course of this litigation. Defendants' argument represents, in effect, a belated attempt to rebut the court's application of the "Keyes presumption" of systemwide illegality in this case. But defendants have endeavored to meet their burden with rhetoric rather than credible evidence. There is no reason to assume that the Court of Appeals will reverse the finding of a statewide violation, based upon applicable law and the evidentiary record in this case.
Defendants have failed to demonstrate that they are likely to succeed on the merits of their appeal. Moreover, as indicated above, they have failed to show that they will suffer irreparable harm if the remedial decree is not stayed. The relevant equitable factors, taken as a whole or individually, tip heavily against defendants' attempt to postpone the implementation of relief in this case. Thus, under the applicable legal standards, defendants' motion for stay of the remedial decree pending appeal must be denied.
For all of the foregoing reasons, it is, accordingly,
ORDERED that defendants' motion to withdraw stipulations or limit their use and to reassert objections to certain stipulations or findings of fact and exhibits shall be, and is hereby, DENIED. It is further
ORDERED that defendants' motion to vacate the remedial order and withdraw the memorandum opinion previously entered in this civil action shall be, and is hereby, DENIED. It is further
ORDERED that defendants' motion to stay the remedial order pending appeal or pending consideration of the motion to vacate said order shall be, and is hereby, DENIED.

APPENDIX

ORDER
On September 15, 1980, the State of Texas, a defendant in the above-captioned civil action, filed a motion for clarification of certain stipulations entered into by all parties prior to trial and agreed to again on the record by all parties when trial commenced on December 3, 1979. These stipulations originated as some 486 proposed findings of fact offered by the plaintiff-intervenors. By the onset of trial, the defendant had withdrawn its objection to all but 30 of these facts, agreeing to stipulate to the remaining 456. These stipulations were entered into evidence as a group at trial, without objection, as Plaintiff-Intervenors' Exhibit No. 409.
Defendant now contends that its concurrence in some 211 of these stipulations was conditioned upon the inclusion of the date and name of each statement's source within the stipulations themselves. Defendant asserts that it intended to stipulate only that the statements had in fact been made, and not to admit the truth of the content of those statements. Defendant asks the court to treat the stipulations in accordance with its interpretation and to incorporate a list of sources appended to the motion within the stipulations admitted into evidence at trial. Plaintiff and plaintiff-intervenors oppose the motion to clarify, denying that *741 any conditions were attached to defendant's willingness to stipulate, and maintaining that all parties should be bound by the terms of the stipulations as admitted at trial.

I. BACKGROUND.

In order to assess the validity of defendant's contentions, it is necessary to examine the history of these stipulations, before, during, and after the trial. The final pre-trial order in this action was filed on November 20, 1978. That order contained some 486 findings of fact proposed by plaintiff-intervenors. Defendant objected to some 295 of those findings and did not contest the remaining 191. On October 31, 1979, defendant's counsel sent a letter to the court which stated in pertinent part:
Defendants propose to withdraw the following listed items from the contested issues of fact in the pretrial order entered in this matter. If the source of the following listed items, i. e., date and name are given, Defendants no longer contest Plaintiff-Intervenor's proposed facts numbers * * *
(The numbers of 211 individual findings of fact were listed consecutively thereafter.)
Thus, of the 295 proposed findings originally contested, defendant now had withdrawn its objections to all but eighty-four. The parties met on November 28, 1979, to confer further about these issues. Plaintiff-intervenors prepared a list of the sources from which their fact statements had been derived in preparation for that meeting. As a result of the conference on November 28th, a final list of "STIPULATED FINDINGS OF FACT" was approved by all parties to be introduced at trial. That list, which contained the same 486 proposed findings of fact originally submitted by plaintiff-intervenors, indicated that the defendant stipulated to all but 30, which it continued to contest. Thus, between the defendant's writing to the court on October 31st and the offering of these stipulations at trial, an additional 54 findings of fact were agreed upon, presumably as a result of the meeting among the parties on November 28th.[1]
The set of stipulations, introduced at the outset of the trial as Plaintiff-Intervenors' Exhibit No. 409, contains nothing on its face to indicate that the "STIPULATED FINDINGS OF FACT" contained therein are limited or conditioned in any way. No sources are stated for most of the stipulated fact statements nor is reference made to any separate list of sources. Plaintiff-Intervenors' Exhibit No. 409 was described and accepted by all parties as follows:
MR. ROOS: And this further document should be denominated Plaintiff-Intervenors' Exhibit 409, and this is denominated Stipulations.
THE COURT: Stipulations of what?
MR. ROOS: It's denominated merely Stipulations. What this reflects, as the court will recollect, in the pre-trial order the parties set forth their proposed findings of fact, and there were various proposed findings of fact of the plaintiff-intervenors that were objected to by the State of Texas. Most of those objections have been withdrawn, and what this document reflects are the plaintiff-intervenors' initial proposed findings of fact that now are stipulated to.
THE COURT: And this is marked as Plaintiff-Intervenors' Exhibit 409?
MR. ROOS: That's correct, Your Honor.
THE COURT: Is it so stipulated, Ms. Dasher?
MS. DASHER: That is so stipulated.
THE COURT: And it is so stipulated by the United States?
MR. RICH: Yes, Your Honor.

*742 THE COURT: All right.
Transcript (TR) 5-6.
Counsel for defendant did not object to this characterization in any way. Immediately thereafter, the court inquired of all parties whether the documents tendered contained all of the stipulations which had been arrived at by the parties. After receiving affirmative assurances from counsel, including counsel for defendant, the court proceeded with the trial.
The opening statements delivered by counsel for plaintiff-intervenors and counsel for defendant both referred to the stipulations of fact, without qualification or condition. Significantly, counsel for defendant began her opening statement with the following concession:
MS. DASHER: Your Honor, it's true that we have stipulated to large parts of this case. All of it tends to be historical. The State of Texas does not have a happy record over the past.
TR. 21.[2]
Throughout the course of the trial, defense counsel made no attempt to limit or condition the stipulations entered into evidence as Plaintiff-Intervenor's Exhibit No. 409. Moreover, defendant's counsel never sought to introduce the separate list of sources for the stipulated fact statements, either as a separate exhibit or as part of the stipulations themselves. No evidence was offered by defendant to rebut or disprove any of the stipulated fact statements.
Following trial, all parties submitted post-trial memoranda to the court. Plaintiffs and plaintiff-intervenors relied extensively on the stipulations contained in Plaintiff-Intervenors' Exhibit No. 409 in framing their legal arguments. Once again, these stipulations were treated as uncontested admissions of fact, without qualification or condition. Far from contesting this utilization of the stipulations, defendant also invoked those same stipulations in its proposed opinion submitted to the court on May 19, 1980. In arguing that the State of Texas had cured the discrimination it has formerly practiced, defendant stated:
Even though the State of Texas has stipulated to many instances of historical discrimination against Mexican-Americans in Texas, that stipulation runs to a history which this Court believes has been substantially remedied both by the orders of this Court and those of other courts in Texas.
Defendant's Proposed Opinion at 111. Thus, consistent with the position it had espoused throughout the trial, defendant maintained, not that the facts stipulated to were false, but that their conceded truth was irrelevant to the claims of present wrongdoing made by plaintiffs.
One additional document sheds light on the meaning and significance attributed to these stipulations by all the parties who agreed to them. In a related case, United States v. Texas (Gregory-Portland Independent School District), defendants State of Texas and the Texas Education Agency, represented by the same Assistant Attorney General who represented them in the case at bar, cited the stipulations contained in Plaintiff-Intervenors' Exhibit No. 409 to support their contention that Mexican Americans had, indeed, been subjected to discrimination in Texas. 498 F.Supp. 1356 (E.D.Tex.1980):
More recently, in United States vs. Texas (Bilingual), No. 5281, this Court accepted stipulations between the United States, the Mexican-American Legal Defense Fund, G. I. Forum, LULAC and the State of Texas to a pervasive history of discrimination against Mexican-Americans in Texas. See, pretrial order, United States vs. Texas, stipulations, December 3, 1979, No. 5281.
*743 Defendants' Brief filed May 23, 1980, at 4. Nowhere in its affirmative reliance on these stipulations in Gregory-Portland did the defendant suggest that those stipulations were qualified in any way.

II. DISCUSSION.

The history of these stipulations, as recounted above, conclusively belies defendant's assertions that its withdrawal of objections was expressly conditioned upon the inclusion of the source within each stipulated statement and that it never admitted the truth of the facts stipulated to. Defendant requests the court to interpret its letter of October 31, 1979, as embodying the entire agreement among the parties and as imposing the above condition and limitation. But that letter nowhere indicates that the defendant was unwilling to stipulate to the truth of the various fact statements, nor does it expressly require the inclusion of sources within the stipulations. On the latter point, the language of the letter is, at best, ambiguous. Its meaning was clarified by counsel for plaintiff-intervenors at trial, when he indicated that defendant was willing to withdraw its objections to many of the fact statements once "we showed them the source of the information, and we did...." TR. 10.
Even if the letter were interpreted as defendant suggests its contents were superseded on November 28th, when counsel for all parties conferred and reached final agreement concerning the stipulations. During that meeting, defendant apparently went well beyond the October 31st letter in withdrawing its objections to some 54 additional statements of fact proposed by plaintiff-intervenors. A new agreement was reached, embodied in Plaintiff-Intervenors' Exhibit No. 409, introduced at trial five days later.
Defendant's position is most directly contradicted by its own conduct with respect to these stipulations, both during and after the trial. At no time did counsel for defendant seek to limit or condition the treatment of these stipulations by the court as admissions of fact binding upon all parties. The list of sources, though in defendant's possession, was not offered into evidence, either as part of the stipulations or as a separate document. Counsel for defendant affirmatively invoked the stipulations as findings of fact, both in her opening statement and proposed opinion filed after trial. Defendant's counsel even used the stipulations as factual proof to buttress her argument in a related case involving the Gregory-Portland Independent School District. The first indication of defendant's desire to dilute or, in its words, "clarify" these stipulations appeared more than nine months after the end of trial.
Finally, defendant's recently contrived theory makes little sense. If defendant merely intended to stipulate that the proposed statements had in fact been made by someone, without conceding their accuracy, why did it continue to object to thirty of the findings proposed by the plaintiff-intervenors? Sources for those particular fact statements were also specified in the source list provided, yet defendant refused to stipulate to them. That refusal is comprehensible only if it reflected defendant's unwillingness to concede the truthfulness of those particular findings, as contrasted with the other 456 findings which were stipulated to. Moreover, defendant makes no claim that it insisted on inclusion of source with the 245 stipulations agreed to in either the original pre-trial order or at the November 28th meeting. No reasons are offered for treating those stipulations any differently from those 211 fact statements agreed to by the October 31st letter.
Under F.R.Civ.P. 16, a pre-trial order, including stipulations entered into, shall control the subsequent course of litigation unless modified "to prevent manifest injustice." Rule 60(b), F.R.Civ.P., authorizes a court to relieve a party from a final judgment, order, or proceeding for, inter alia, "mistake, inadvertence, surprise, or excusable neglect". Under both of these standards, defendant's motion for clarification must be denied.
A stipulation of fact entered into by the parties is controlling and conclusive, resolving any factual issue in accordance with its *744 contents. See Downs v. American Employers Insurance Co., 423 F.2d 1160, 1164-65 (5th Cir. 1970). It is well settled that stipulations entered into voluntarily are not to be set aside or modified except under exceptional circumstances. Del Rio Distributing v. Adolph Coors Co., 589 F.2d 176, 178 (5th Cir. 1979); Fairway Construction Co. v. Allstate Modernization, Inc., 495 F.2d 1077, 1079 (6th Cir. 1974) (per curiam); Fenix v. Finch, 436 F.2d 831, 837 (8th Cir. 1971). Courts are bound to enforce stipulations as written, even if the government is the party bound. A. Duda & Sons Cooperative Ass'n. v. United States, 504 F.2d 970, 975 (5th Cir. 1974).
The burden on a party seeking relief from a stipulation it has entered into is a heavy one, requiring a demonstration "with clear and convincing force" of manifest injustice. City of Lakeland, Florida v. Union Oil Co. of California, 352 F.Supp. 758, 768 (M.D.Fla.1973). As litigation proceeds from the pretrial phase into trial and beyond, the burden on one seeking to alter or "clarify" a stipulation of fact necessarily increases. Otherwise, the effectiveness of pre-trial orders entered by the court in managing litigation would be seriously undermined. Thus, "if a party fails to seek relief from a stipulation until after trial has begun, that factor does not preclude relief but it must be considered." Chatzicharalambus v. Petit, 430 F.Supp. 1087, 1090 (E.D.La.1977). Where the first sign of dissatisfaction surfaces nine months after the trial has ended, the party seeking relief must make a compelling showing of injustice in order to prevail.
No such showing has been made here. The stipulations, as written and agreed to by defendant in open court, are clear on their face. The defendant's most recent declaration of intent with respect to these stipulations remains unconvincing and unsupported by the evidence. Defendant's concurrence in these findings of fact was a strategic decision which cannot be retracted or undone at this late date. The use to which defendant put these stipulations, both in this case and a related one, as well as defendant's failure to object or seek clarification during the trial itself, necessarily waived any objection to the treatment of these stipulations as conclusive admissions by all parties.
If the court were to accept defendant's argument and "clarify" these stipulations, the trial would have to be reconvened and the plaintiffs given an opportunity to present evidence proving facts previously conceded by defendant. Such a procedure would further delay the rendering of judgment in this case, to the detriment of all parties and the public alike. There is nothing in the record before the court which justifies such consequences.
On the basis of the foregoing, it is accordingly ORDERED that defendant's motion for clarification of certain stipulations referenced in Defendant's Exhibit No. 76 is DENIED.
NOTES
[1] That order, referred to repeatedly herein, is attached as an appendix.
[2] Defendants claim that an attorney's authority to enter into evidentiary stipulations which bind his client must be determined by reference to state law. The sole decision cited in support of that contention is Glazer v. J. C. Bradford & Co., 616 F.2d 167 (5th Cir. 1980) (per curiam). The issue in Glazer was the validity of a settlement agreement approved by plaintiff's attorney without his client's authorization. Since Glazer was a diversity action for breach of contract, the Court of Appeals ascertained the applicable legal standards in accordance with the rule of Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Concluding that the validity of a settlement agreement presented a substantive issue under the law of agency, the Court applied the statutes of the forum state (Georgia) in upholding the settlement as binding.

In contrast to Glazer and the numerous diversity cases cited therein, the instant action arises under the Constitution and laws of the United States. 28 U.S.C. § 1331. Accordingly, this court is sitting in its federal capacity and must be guided by provisions of federal law. Of course, even in a case founded on federal question jurisdiction, the law of the forum state may be relevant in limited respects. Thus, for example, the existence of a constitutionally-protected property interest in continued employment may be ascertained through reference to state law. Perry v. Sindermann, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). The power of corporate officers to settle a pending federal derivative suit depends upon the laws of the state of incorporation. Burks v. Lasker, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). But neither reason nor precedent supports relying on state law to determine whether an attorney may enter into evidentiary stipulations in a federal court exercising its jurisdiction under 28 U.S.C. § 1331.
Even if Texas law were applicable in this context, however, the result would mirror that reached under the federal precedents cited above. An attorney in the Texas courts is impliedly authorized to stipulate concerning any fact to be established by evidence. Admissions of counsel made in open court for the purpose of dispensing with the introduction of evidence are binding and irrevocable. 7 Tex. Jur.3d, Attorneys at Law § 60. On the other hand, an attorney has no power under Texas law to compromise his client's claim or enter into a stipulation of dismissal without specific authorization. Cleere v. Blaylock, 605 S.W.2d 294, 296 (Tex.Civ.App.Dallas 1980), no writ. The distinction is between an attorney's agreeing to narrow facts or issues in dispute, which is authorized, and his agreeing to surrender his client's claim altogether, which is not. In this case, the conduct at issue was the entering into evidentiary stipulations by defendant's attorney at trial. Under Texas state law, like federal law, such actions fall within the implied authority of a lawyer-agent.
Defendants' counsel in this case was not a mere member of the private bar, but the Attorney General of Texas. The state courts have repeatedly confirmed the broad discretion accorded the Attorney General in the exercise of his responsibility to protect the interests of the state through litigation. E. g., Charles Scribner's Sons v. Marrs, 114 Tex. 11, 262 S.W. 722, 727 (1924); Bullock v. Texas Skating Ass'n., 583 S.W.2d 888, 894 (Tex.Civ.App.Austin 1979), writ ref'd. n. r. e. As the Texas Supreme Court observed in Marrs, "the Attorney General must exercise judgment and discretion, which will not be controlled by other authorities." 262 S.W.2d 727. Thus, under state law, the Attorney General necessarily had power to enter into evidentiary stipulations as a strategic decision at trial. Although the Attorney General did not personally represent the defendants at trial, his designated Assistant Attorney General is authorized to carry out his legal responsibilities, and the Attorney General is responsible for the acts of his Assistant within the scope of her employment. Langdeau v. Dick, 356 S.W.2d 945, 959 (Tex.Civ.App.Austin 1962), writ ref'd. n. r. e.
[3] In their brief in support of this motion, defendants erroneously state: "The Court has recognized that defendants' counsel believed that the stipulations were not relevant to the proceeding." On the contrary, this court has no way of knowing what defendants' counsel believed about these stipulations or any other aspect of this case. These evidentiary agreements appeared consistent with other tactical decisions made by counsel before, during, and after trial.
[4] In the alternative, defendants request that the use of the stipulations at issue be limited to this particular civil action. The admissibility of these stipulations in any other proceeding must be determined by the presiding judge within the facts and circumstances of a particular case. It would not be proper for this court to rule on evidentiary issues in cases which may be pending in other courts or which may not have been filed as yet. Accordingly, the relief requested in the alternative shall be denied.
[5] Defendants do not specify whether their motion is one to alter or amend a judgment, pursuant to Rule 59(a), F.R.Civ.P., or for relief from a final judgment, pursuant to Rule 60(b). Since defendants waited six months after the issuance of the memorandum opinion in this case to file their motion, that motion would clearly be untimely under Rule 59(e): "A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment." Under Rule 60, it is doubtful that the motion has been "made within a reasonable time," as required. Nevertheless, since this particular motion is effectively incorporated within defendants' motion for stay, discussed infra, it will be considered on its merits in accordance with the provisions of Rule 60(b).
[6] Ironically, the defendants, who now claim that the constitutional issues were removed from the case by these amended motions for relief, formerly contended that those very issues remained in controversy despite the filing of those motions. On October 27, 1977, defendants filed an answer to the plaintiff-intervenors' amended motion for supplemental relief, stated as their seventh listed defense: "Defendants ... further allege that any action of this court must of necessity take into consideration the constitutional basis of the allegations asserted in Plaintiff-Intervenors' Amended Motion whether they are designated as constitutional claims or not. All of the case authorities cited in their Amended Motion were decided on a basis of constitutional violations ...." Answer to Amended Motion for Relief (October 27, 1977), p. 9.
[7] The record contains no specific explanation of why the constitutional claims were brought back into the case. During the course of protracted, complex pre-trial proceedings, such modifications in the nature of asserted claims or defenses are not unusual or even unexpected. One event which might have contributed to the plaintiffs' apparent change in strategy was the Supreme Court's decision in the case of University of California Regents v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750, announced on June 28, 1978. In that case, as noted in the memorandum opinion, five members of the Court indicated that the elements of a Title VI violation were co-extensive with those under the Fourteenth Amendment, thereby raising strong doubts regarding the continuing viability of Lau v. Nichols, decided in 1974. With their chances for success on a separate Title VI claim suddenly diminished, plaintiffs may have decided to re-emphasize their constitutional claims as set forth in their complaint in intervention filed in 1972.
[8] Although none of the parties has mentioned it, the final pre-trial order was apparently never formally signed before or after it was filed on November 20, 1978. Nevertheless, it is readily apparent that the order was relied upon by all parties and the court as fully operative at trial. In preparing the lengthy order, all of the parties submitted their own lists of witnesses, exhibits, depositions, and proposed findings, which were then incorporated into a single document. Written additions and modifications to the final pre-trial order were made by agreement or by leave of court during the twelve months which elapsed between the filing of the order and commencement of trial. The contents of the pre-trial order were referred to on numerous occasions during the course of trial. E. g., T. 4, 5, 8, 9, 11, 12, 862. Thus, despite the inadvertent failure to require the formal signing of the order, it must be treated as controlling in accordance with Rule 16. The Court of Appeals has held that a pre-trial order may merit plenary consideration notwithstanding the fact that it has not been signed. Robertson v. Malone, 190 F.2d 756, 759 (5th Cir. 1951); see also United States v. Jones, 176 F.2d 278, 280 (9th Cir. 1949).
[9] Although the court did not directly address this issue in its memorandum opinion, the absence of adequate steps to overcome the effects of past discrimination was also properly within the scope of plaintiffs' claims under Title VI of the Civil Rights Act of 1964. 42 U.S.C. § 2000d. The regulations promulgated to implement that statutory provision state: "In administering a program regarding which the recipient has previously discriminated on the ground of race, color, or national origin, the recipient must take affirmative action to overcome the effects of prior discrimination." 45 C.F.R. § 80.3(b)(6)(i).
[10] The precise meaning of this preservation clause and its application in the present case are discussed infra, at p. 728.
[11] The precise meaning of § 7 of the repealing statute, stating that "This Act shall not apply to any action commenced on or before the date of enactment," remains somewhat unclear. The legislative history of the statute indicates that the purpose of § 7 was to protect the settled expectations of litigants based upon the law existing at the time they commenced their lawsuits. S.Rep. 94-204 at 14. In a case filed before the date of repeal [August 12, 1976] with no constitutional cause of action, there would have been no reasonable expectation that the trial would be held before a three-judge court. In such a case, would the addition of a statutory challenge on constitutional grounds after the date of repeal require the convening of a three-judge court?

In Concerned Citizens of Vicksburg v. Sills, 567 F.2d 646 (5th Cir. 1978), the Court of Appeals remanded a suit challenging the constitutionality of a state statute which had been dismissed under the abstention doctrine by a three-judge district court prior to the repeal of § 2281. In light of the repeal, the Court concluded, a three-judge court was not required to hear the case on remand. 567 F.2d at 648, n. 1. Concerned Citizens could be read as meaning that a three-judge court need not be convened in any case where the constitutional issues could not be considered on their merits until after August 12, 1976. Under such reasoning, a three-judge court would not be required in the present case, since plaintiffs' constitutional claims were not reinstated until the filing of the final pre-trial order on November 20, 1978. Such a narrow interpretation of the "savings clause" is justified in light of demonstrated congressional intent to abolish the three-judge court in such cases. See Costello v. Wainwright, 539 F.2d 547, 553 (5th Cir. 1976) (en banc) (Tuttle, J., dissenting). In any event, the "savings clause" surely did not expand the substantive content of § 2281. Under the mandated interpretation of that statute, as noted above, plaintiffs' claims in this case did not satisfy the requirements for the convening of a three-judge court.
[12] It is always hazardous and venturesome to speculate about a future decision of the Court of Appeals. Accordingly, the analysis which follows should be treated as simply a prediction, and nothing more.
[13] Defendants argue that the enactment of S.B. 477 on June 12, 1981, created a new program for addressing the learning difficulties of LEP students which must be given a chance to work before it can be evaluated as a success or failure. Yet the new statute does not substantially alter the theoretical basis of the defendants' approach, nor does it significantly increase the resources allocated to carry out that approach. Limited ESL instruction is still authorized in school districts falling under a specified numerical threshold and in all grades after elementary school. Remedial or compensatory programs for children who fall behind in academic areas while becoming proficient in English are not mandated. The new legislation contains some reform provisions, but it does not establish a new approach. If every modification in an educational program required the evaluation of its effectiveness to begin anew, the determination required by the Court of Appeals under the third prong of Castaneda might never be completed. Accordingly, the effectiveness of the state's instructional program for LEP students, as established by the Bilingual Education Act of 1973 and extended by the new legislation, can be accurately measured on the basis of the record before the court.
[14] It should be noted that Castaneda did not involve any demonstrated history of intentional discrimination against LEP students based upon their national origin. Thus, the required elements of an educational program to eliminate the lingering effects of such discrimination, a key issue in this case, was not considered there. Indeed, the Castaneda court specifically distinguished that case from this one in a footnote. At 1004, n.6.
[1] The fact statements not agreed to by defendant in either the pre-trial order or its letter of October 31, 1979, but nevertheless stipulated to at trial, are numbered as follows:

2, 35, 307, 321, 329, 332, 343, 344, 402, 403, 404, 423, 425, 438, 444, 448, 458, 463, 497, 402(a), 503, 513, 514, 515, 605, 612, 617, 812, 819, 832, 1004, 1005, 1007, 1008, 1009, 1010, 1013, 1014, 1015, 1016, 1017, 1018, 1019, 1020, 1035, 1036, 1118, 1119, 1121, 1124, 1202, 1206, 1401, 1402.
[2] Counsel for defendant went on to argue that the court's duty was to evaluate the present programs of education for limited English-speaking children in Texas, rather than to explore the state's historical deficiencies. Throughout the trial, defendant's counsel took the position that while Texas had admittedly treated these students unfairly in the past, great strides were being made to remedy those shortcomings. That approach constituted a strategic decision by counsel, not to be second-guessed by the court.